## THE TRENT MILLING CO. v. WELLS-ABBOTT-NIEMAN CO.

*Contracts — Exclusive sales agency — Specific performance — Terms too indefinite to enforce, when — Injury to good-will of trade name — Agent can not recover damages, when.*

1. A contract of exclusive agency for the sale of goods, which is so indefinite in terms as to duration, price and quantity that a court is unable to ascertain the intention of the parties, will not be enforced.

2. A contract which provides that the agent should have the exclusive sale of goods "as long as he gives us a reasonable volume of business," is too uncertain to be enforced.

3. An agent can not recover damages for injury to the good-will of a trade name of a product sold under such a contract in the absence of a property interest in the agent; and such property interest does not exist where such contract depends upon the continued acquiescence of the principal, who could withdraw the agency at will.

(Decided December 30, 1918.)

ERROR: Court of Appeals for Hamilton county.

*Mr. Sherman T. McPherson,* for plaintiff in error.

*Messrs. Dickerson, Black & Dickerson,* for defendant in error.

SHOHL, J. This suit was brought by the defendant in error against the plaintiff in error. An answer and cross-petition were filed, and after the original plaintiff dismissed the petition without prejudice, the case was heard upon the cross-petition and reply.

In June, 1915, the president of the plaintiff in error, which for convenience will be called the Trent Company, went to Schuyler, Nebraska, and

made an arrangement with the defendant in error, hereafter called the Wells Company, to handle a new brand of flour, to be known as "Wanco." The agreement was confirmed by letter dated June 17, 1915, which sets forth the details. The Trent Company was to have the exclusive sale of the Wanco brand in territory around Cincinnati, "as long as you give us a reasonable volume of business on that brand."

The substantial part of the letter is as follows:

*"June 17th, 1915.*

"THE TRENT MILLING CO.,
"Cincinnati, Ohio.
"Dear Sirs:

"Confirming the arrangement that we talked about with your Mr. Trent during his visit here in Schuyler.

"We understand that you are to have the exclusive sale of our flour under our Wanco brand in limited territory around Cincinnati as long as you give us a reasonable volume of business on that brand.

"To help you get started we have agreed, in addition to the usual support that we give our jobbers, to pay the sum of $150.00 per month to apply against the traveling expenses and salary of a specialty-man.

"This man is to confine his first four days of every week to selling Wanco flour exclusively, or flour under a dealer's private brand, to be billed at the differential agreed upon for Wanco.

"To off-set the additional expense that we are put to for the specialty-man's salary and expense,

we are to bill all flour under the Wanco brand at 15c per bbl. above the basis on which you contract for our flour regularly. It is further understood that all flour which Mr. Tepe sells in territory outside of Cincinnati, whether under the Wanco brand or our other brands, or under the dealer's private label brand, is to be billed at 15c per bbl. above the basis you regularly contract on.

"It is understood between us that we pack our regular Golden West grade under your Wanco sacks.

"We talked about keeping this arrangement in regard to the specialty-man, up for a period of six months. In this connection we want to say that we would not devote any time or thought to a proposition if we did not intend to make it a permanent one, and we do not believe that any permanent results can be obtained in any shorter period than six months. We have an investment there that we want to see bring results. At the same time we do not want to bind ourselves to continue this for any definite period any more than we should want to bind ourselves to work say Mr. Babbitt's territory for a definite period, but we intend to continue it long enough to produce the proper results.

"If both of us agree at the end of six months that this work should be continued longer for the mutual benefit that we should derive, we will take it up with you at that time and decide to what extent we will go further."

The arrangement was carried out for the six months, and the Trent Company claims that thereafter when the Wells Company filled orders they

did not maintain the grade of the product, and thus injured the good-will in the trade name, in which the Trent Company claims a special property by reason of the arrangement. All other claims for damages were abandoned. The special property interest in the good-will is dependent on the binding force of the arrangement. If the right to the exclusive agency was dependent upon the continued acquiescence of the Wells Company, and if the Wells Company could withdraw the agency at will, it is difficult to see how the Trent Company had any valuable property right. The interpretation of the Trent Company, as shown by the cross-petition, is that the agency should last "to July 1, 1916, and to continue thereafter so long as mutually agreed upon between the parties." The trial court took the view that the arrangement set forth in the letter provided for a unilateral contract, and instructed the jury to return a verdict against the Trent Company.

The duty of the court is to ascertain the intention of the parties. Persons may agree to buy and sell goods to be used by the buyer to fill the wants of his business. Ordinarily when such a contract is made, the price of the goods, quantity, and the duration of the relation are fixed. However, even if these elements are not fully expressed, if the intention of the parties can be determined, the contract will be enforced. The agreement in this case presents difficulties as to each of these elements. We are impressed particularly with the indefiniteness of the duration of the agency. Taking the letter as a whole it appears that the relation was to last for some time, and the Wells Company wanted to

make an arrangement of some permanence, but they did not care to give the Trent Company the exclusive agency forever subject to being able to prove that the volume of business 'was not "reasonable." The rules respecting certainty are well known. The obligation must be so stated that the court can determine ultimately whether the contract has been performed or not. (1 Page on Contracts, Section 28.) A case which illustrates the rule is *Cummer* v. *Butts,* 40 Mich., 322, where Cummer was given the right to sell Butts' lumber, either party having the right to cancel "for good cause." It was held that the term "good cause" was too vague to be fairly intelligible, as the court said the expression had no frontier that could be defined. This court is of the opinion, in view of all of the provisions in the letter, that the arrangement for the exclusive sale "as long as you give us a reasonable volume of business" is too uncertain to be enforced.

Nor is the contract sufficiently definite as to quantity. The Trent Company was not obliged to take any flour, and might have ordered enormous amounts. If the amount to be furnished under the contract can not be ascertained it is not enforceable. The point is well illustrated where a dealer agrees to sell to another all the lumber he may "handle" during a year at certain prices; as in the case of *Phillips* v. *Farrin Lumber Company,* 8 N. P., N. S., 274. He might handle much or little, depending upon conditions. Such an agreement, unlike a contract to buy the requirements of a particular furnace or the output of a particular mill, is void. See *Cold Blast Transportation Co.* v.

*Kansas City Bolt & Nut Co.,* 114 Fed. Rep., 77; *Loudenback Fertilizer Co.* v. *Tennessee Phosphate Co.,* 121 Fed. Rep., 298; *Crane* v. *C. Crane & Co.,* 105 Fed. Rep., 869; *American Cotton Oil Co.* v. *Kirk,* 69 Fed. Rep., 791; *Artemus-Jellico Coal Co. et al.* v. *Ulland et al.,* 7 C. C., N. S., 605. See also *Lima Locomotive, etc., Co.* v. *National Steel Castings Co.,* 155 Fed. Rep., 77, and note to same, 11 L. R. A., N. S., 713.

It follows therefore that the agreement stated in the letter is without binding force. The Wells Company could have destroyed the agency with impunity by mere notice that they did not care to have it continued. It may be that as long as they filled any orders their goods must be up to the sample or specifications, and that upon failure to comply with the terms of an accepted order they would have rendered themselves liable to their vendee for breach of contract. *Cold Blast Transportation case, supra,* at page 81, and Pollock on Contracts (3 ed.), 196, note 10.

The plaintiff in error claims no damages other than consequential injury to the trade name. The cross-petition alleges defects in the flour furnished after January 1, 1916, claiming that it was not up to the standard fixed by the agreement. If this had been proved there should have been a judgment at least for nominal damages. *Bank* v. *Telegraph Co.,* 30 Ohio St., 555, and *Myers* v. *Sunlight Laundry Co., ante,* 275.

But the parties, at the time the court below arrested the case from the jury, omitted proof of this, with the apparent understanding that the sole question which they desired this court to review

was the right to substantial damages, waiving mere nominal damages.

The court below was correct in its view that the arrangement set out in the letter gave the Trent Company no property interest in the good-will of Wanco flour, and the Wells Company is not liable for any damages done to that good-will.

It follows therefore that the judgment of the superior court should be affirmed.

*Judgment affirmed.*

JONES, P. J., and HAMILTON, J., concur.