## GENERAL MOTORS CORP. v. KEENER MOTORS, Inc.

### No. 11380.

United States Court of Appeals
Sixth Circuit.

Feb. 14, 1952.

Luther Day, Cleveland, Ohio (Luther Day, George H. Rudolph, Cleveland, Ohio, on the brief; Jones, Day, Cockley & Reavis and Alexander Ginn, all of Cleveland, Ohio, Henry M. Hogan, P. J. B. Crowley, Detroit, Mich., of counsel), for appellant.

L. M. Cailor, Youngstown, Ohio (L. M. Cailor, Youngstown, Ohio, on the brief), for appellee.

Before MARTIN, McALLISTER and MILLER, Circuit Judges.

MARTIN, Circuit Judge.

In an action *ex contractu* brought in the United States District Court against General Motors Corporation, the appellee, Keener Motors, Inc., recovered judgment on the verdict of a jury for $28,000 damages.

On appeal, General Motors Corporation insists (1) that there was insufficient evidence of a binding legal obligation entered into by it to warrant submission of the case to the jury; (2) that, assuming only argumentatively that the alleged contract came into existence, there was insufficient evidence that appellant breached it to warrant submission of the case to the jury; and (3) that no properly admissible evidence was offered which established or tended to establish any damages suffered by appellee in consequence of the alleged breach of contract.

The circumstances from which the justiciable controversy arose are somewhat involved and require detailed statement.

In 1938, Evan J. Keener obtained a charter for Keener Motors, Inc., in which he owned ninety-nine percent and his wife owned the other one percent of the corporate stock. Keener was an experienced automobile dealer, having handled numerous makes of automobiles. On June 20, 1940, Keener Motors, Inc., entered into a signed contract with General Motors Corporation for the nonexclusive dealership in Pontiac motor vehicles for the metropolitan area of Youngstown, Ohio. A new contract, or direct dealer's Pontiac selling agreement, was executed between the parties on October 1, 1941, covering nonexclusive rights in the same territory. This second agreement continued in effect until terminated by mutual consent of the parties a year later, on October 2, 1942, after the United States entered into World War II, which had properly required the suspension of its manufacture of passenger automobiles. At the close of the submission of its proof, appellee amended its complaint to aver that the alleged contract was "terminated", not "suspended". During the period in which the contract was in effect, 228 motor vehicles were delivered to appel-

lee by the Pontiac Division of General Motors.

On October 2, 1942, Keener, being subject to draft, proffered his services for United States Army work and went to Detroit to take care of parts replacement for tanks needed in North Africa. When he inquired how much time he would have to close out his business, he was told, "You start yesterday." So, he immediately returned to Youngstown and, with the help of General Motors, disposed of his stock on hand and terminated his agency under conditions which his attorney described as "mutually agreeable."

On March 2, 1942, prior to the termination of the Keener contract, Alfred P. Sloan, Chairman of General Motors Corporation, issued a message to General Motors dealers, in which he discussed the company's policy with respect to car distribution after the war should end. His message stated that it was intended that, for dealers who should accept the responsibility of maintenance of active service facilities for the duration (involving at best a reduction of profits, or perhaps the acceptance of losses), there would be provided the opportunity of regaining their positions "as compared with other dealers who might at that time be newly appointed." It was stated further that, for a period of two years after resumption of production, from the cars available for domestic distribution General Motors would extend priority in car shipments on a stated basis to dealers whose active service had been continuous during the period of suspended production before any cars would be made available to new dealers. The Sloan message asserted that certain dealers might decide to liquidate under conditions mutually agreeable as between themselves and General Motors; and, under caption "Consideration for Reappointment", stated: "It will be the policy to accord first consideration in dealer replacements to those dealers who terminated under conditions which were mutually agreeable to the dealer and the division, provided they meet the current qualifications at that time."

On March 12, 1943, Murray, Acting General Sales Manager of Pontiac Motor Division, General Motors Corporation, addressed a letter to Keener Motors, Inc., in which he referred to Chairman Sloan's message of March 2, 1942, sent to General Motors dealers, wherein the intention was expressed to accord first consideration in dealer replacement to those dealers "who terminated under conditions mutually agreeable to the dealer" and to the division under which he operated, provided he should meet that division's current dealer qualifications. The Murray letter stated: "We are pleased to advise you that since you terminated your Pontiac Selling Agreement under such conditions, we will give your application for a Pontiac franchise preferential consideration after production of Pontiac automobiles has been resumed, provided you meet our current dealer qualifications at that time", with a further proviso that a written application for such franchise be filed by Keener with General Motors within three months from the date on which resumption of production of Pontiac automobiles is announced. The letter continued: "If your former location is available at that time, you will, of course, be given first consideration for that point if you so desire, otherwise we will endeavor to place you at some open point which is available and mutually agreeable to you and ourselves."

Shortly after receipt by Keener of this letter from Murray, Keener received a second message to General Motors dealers from Chairman Sloan, supplementing his message of March 2, 1942. This message was quite long, was addressed to General Motors dealers and captioned, "Dealer Problems in the Present Emergency". The general situation was discussed and, under the heading "Some Specific Policies", it was asserted that the present message was intended to clarify and modify certain policies outlined in the previous message, it being "impracticable to lay down definite and complete administrative technique within the confines of a message of this kind." The letter went on to say: "This is within the jurisdiction of the sales departments of the Corporation's various operating divisions. The principles, however, can be stated in broad terms."

This Sloan "message", in substantially the same manner as did the Murray letter, made reference to the specific "policy" of General Motors in considering reappointments of dealers who had terminated their contracts and emphasized the fact that "during the two-year period following the resumption of production, cars cannot be made available to new or reappointed dealers until the basic allotment and bonus have been provided for all dealers of record on the date production is resumed." The second Sloan message concluded: "The above comments on the general situation merely express one point of view. The surest way to be right is to say nothing. And it is the easiest way. Perhaps I should add that all I have said is 'subject to change without notice'. But I have tried to pass on to General Motors dealers my beliefs for what they may be worth to them in their thinking and particularly their planning for today and tomorrow."

Some thirteen months after receipt by him of Murray's letter, Evan Keener, on April 11, 1944, purchased from a Mrs. Gough and her husband the Chevrolet building in Youngstown, Ohio, next door to his former location. Almost immediately after acquiring ownership of the Chevrolet building, Keener leased it to Gough for a term "until six months following the cessation of hostilities in the European Theater of the World War." On October 9, 1944, Keener Motors, Inc., notified Murray by letter that it had acquired this property and asked for any information which General Motors cared to give relative to resumption of production or post-war dealer plans.

This letter was answered under date of October 12, 1944, by Davison, Assistant General Sales Manager of the Pontiac Motor Division of appellant. He expressed his pleasure that Keener desired to take on again Pontiac representation in Youngstown and said he would see whether it would be possible to work out the arrangement desired by Keener. He said, however, that inasmuch as a number of new policies regarding dealer locations had developed during the war period, it would be necessary "to do some checking" before a definite answer could be given Keener. The letter concluded that the company would get in touch with Keener just as soon as there was something specific to report.

Two weeks later, on October 26, 1944, Davison kept his promise to report specifically. He wrote a letter to Keener, stating in the first paragraph that, after checking the possibility of signing a new agreement with Keener Motors, Inc., as a Youngstown dealer, the Pontiac Motor Division did not feel justified in offering him a franchise at the time, inasmuch as it already had representation in Youngstown and only a limited number of cars would be available for new dealers after the production of new cars should be resumed. Attention was directed to the statements in the two Sloan messages to the effect that dealers who had carried on continuously active service during the time of suspended production would be given priority. The letter concluded: "If, at a later date, sufficient new cars become available to sign a second dealer in Youngstown, or if another point becomes available in which we feel you might be interested, we will be very glad to give you preferred consideration."

On October 4, 1945, Bathrick, General Sales Manager of Pontiac Motor Division, wrote the following letter to Keener Motors, Inc.: "You are hereby advised that production of Pontiac passenger cars for domestic distribution was resumed on this day. If, therefore, you wish to be given preferential consideration for a Pontiac Franchise, you must file a written application for such franchise with the undersigned within three (3) months from the aforesaid date on which resumption of production occurred, that is, not later than January 4, 1946, and, further, you must meet Pontiac's current dealer qualifications at the time such application is made." Then follows a paragraph relating to the filing of an application by one in the Armed Forces who had not been demobilized. An acknowledgment form was enclosed.

On October 26, 1945, Keener Motors, Inc., submitted for the attention of Bathrick an application by letter with the information that Keener owned a building on Market Street in Youngstown, Ohio, large enough for the display of six cars, also a stock room and a service department in which

eight men could work at the bench, in addition to a grease and wash rack department and a paint and body department. The letter said that he had service and shop equipment in storage, salesroom and office equipment in good condition and ready for use on February 1, 1946; and that he had an adjoining used car lot with space for thirty cars. He enclosed a picture of the building and offered to furnish any additional information desired.

The reply to this letter was dated November 7, 1945, and was signed by Thompson, Assistant General Sales Manager. It made the assertion that, due to commitments to Pontiac dealers who had operated throughout the war period and to the uncertain factors existing, the company did not contemplate—at least for the present—a second Pontiac dealership in Youngstown, Ohio. Regret was expressed that Keener's application could not be considered at the time and he was assured that, when it was believed that circumstances warranted the appointment of a second dealer at Youngstown, Keener's application would be given preferential consideration if he should meet the then current qualifications. Appreciation of Keener's continued interest in the Pontiac franchise was expressed.

An issue of fact arose from the conflicting testimony of Keener and that of Thompson concerning conversations between them. Keener testified that in a talk with Thompson in Cleveland shortly after he mailed his letter of October 26 to Pontiac, Thompson had assured him that Keener had done everything he could do, that it was just a question of a little time until he would have his Pontiac franchise, and that the application, all in order, was in Thompson's office. Keener testified further that, in a second conversation with Thompson in January of 1946, a short while before the latter quit his job as Cleveland Zone Manager to become a dealer at Cuyahoga Falls, Ohio, he told Keener that he thought from the way it looked that Keener would get his Youngstown dealership about August or September of the current year. Thompson denied Keener's version of the conversation, and swore that he told Keener that his application was in order, and that

when a point became available to put in another dealership, Keener would be given first consideration for that point. He said that he had made no reference to any "time element". He said further that he told Keener that as Zone Manager he had no authority to designate whether the point would be available, or not, that being something which "had to be cleared in the central office". Thompson explained that, while there was no restriction on his authority to sign a selling agreement, he did not have authority to place a dealer in the territory, and that he definitely had disclosed this fact to Keener. Questions of fact as between Keener and Thompson concerning the conversations would, of course, be for the jury; but the agent's representations of his authority would not, as a matter of law, bind his principal.

We find no evidence in the record to support the argument of appellee that Thompson had authority as Zone Manager to make final selection of a dealer or dealer location, or to make an oral selling agreement. We think the evidence establishes the contrary. Ward, who was head of the sales department of the Pontiac Division at the time of the trial, testified as to the authority of zone managers. He said that they made recommendations, pertaining to selection of dealers for their zones, through proper channels; that is, through the Regional Manager's office and, in turn, through the Assistant General Sales Manager's Office, and then to Ward. He stated that, when the information, recommendations and reports came to his desk, he made the final decision after careful analysis as to whether or not the prospective dealer would be acceptable. If a dealer was so approved, the Zone Manager was given authority to conclude arrangements with him.

In 1940, Ward had been Zone Manager of the Cleveland area and, in such capacity, had dealt with Keener Motors, Inc., with respect to the obtaining of its original Pontiac dealership. He testified that, at that time, he had discussed with Hopper, who had the major investment in the Buckeye Pontiac Company operating in Youngstown, the fact that it appeared to him as if the automobile business were "coming out of

the doldrums", and that increased business might be expected in the Youngstown area; but that he advised Hopper that it would be unwise for Buckeye to expand its business in order to get the additional volume anticipated. He added that he thought it would be wise to put a second Pontiac dealer in the city of Youngstown, proper, rather than for Buckeye to increase its activity and expenses to get the additional business. Hopper agreed, with the result that Keener Motors, Inc., received its first nonexclusive dealership contract of June 20, 1940.

The same territory covered by the direct dealer's agreement with appellee was embraced in an associate dealer's selling agreement between Buckeye and Struthers Auto Sales, approved by Pontiac on January 2, 1940, and in effect when Keener Motors, Inc., first became a direct dealer in the Youngstown metropolitan area. Struthers Motor Auto Sales had represented Raybuck at Struthers, Ohio, from 1936 until October 1, 1941, when it sold out to Raybuck Motor Sales, an unincorporated business operated by Raybuck individually. It thus appears that, prior to World War II, there were three Pontiac dealer locations in Youngstown, Ohio, namely: the earliest direct dealer, Buckeye Pontiac Company; its associate dealer, Raybuck, individually; and the appellee company. It would appear that the three possessed an identical nonexclusive right to sell Pontiac motor vehicles in the Youngstown metropolitan area.

We regard it as immaterial to go into a discussion of the status of the Wilson Agency, successor to Heck, in North Lima, Ohio. The appellee complains of the fact that, while it was denied a renewal of its Pontiac dealer's agency in Youngstown, Raybuck (a returned soldier) was, on September 21, 1945, granted an associate dealer's selling agreement covering Struthers, Ohio, an adjoining city, as well as non-exclusive selling rights within the metropolitan area of Youngstown; and that, on December 4, 1945, Wilson was given an associate dealer's exclusive selling-rights agreement within the corporate limits of North Lima, Ohio, and "non-exclusive selling rights in all other communities in which no authorized Pontiac dealer is located or which are not within protected territory of an authorized Pontiac dealer or dealers."

Shipments to North Lima totaled only 32 cars in 1946; 49 in 1947; and 57 in 1948. But appellee complains that the associate dealer at Lima actually sold automobiles in the Southside area of Youngstown where Keener had been originally established in 1940, while he was not accorded a renewal of his Pontiac agency.

In the spring of 1948, Keener Motors, Inc., was offered a Pontiac dealership at Sewickley, Pennsylvania, which was in the metropolitan area of Pittsburgh, some sixty miles from Youngstown. The anticipated shipment of Pontiacs to that point for the year 1948 was 190 automobiles, which was comparable to shipments to Keener's location in Youngstown, to which he had been shipped 197 Pontiac automobiles in 1941. Keener turned down the Sewickley proposition.

Following this rejection of the tendered territory, Ditz, Assistant General Sales Manager of Pontiac Motor Division of the appellant company, wrote to Keener, personally, pointing out that he had advised Keener that the company had no intention of setting up another point in the Youngstown area for sometime to come, as production did not warrant it; and that Keener had turned down the offer of a similar point at Sewickley, Pennsylvania, because he felt it did not warrant the investment. He enclosed a release, which he requested Keener to sign and return for the company's files so that it might be clear of its present obligation to him. This letter closed with the assurance that, if at some future time it should be decided that Youngstown warrants an additional Pontiac representation, the company would be glad to give Keener every consideration. He was thanked for his cooperation. Keener did not sign the waiver.

On June 11, 1948, Ward, General Sales Manager, wrote Keener Motors, Inc., the following final letter: "Subsequent to the effective date of the voluntary cancellation of your former Pontiac Franchise at Youngstown, Ohio, you received Mr. Verne L. Murray's letter of March 12, 1943, wherein you were advised that since you

had terminated your Pontiac Selling Agreement under conditions mutually agreeable to yourself and Pontiac Motor Division, your application for a Pontiac Franchise would be given preferential consideration after production of Pontiac automobiles had been resumed subject to the conditions enumerated in said letter.

"As you have been advised on several occasions, Pontiac Motor Division does not, at the present time, contemplate re-opening the dealership at Youngstown, Ohio, which you formerly operated. However, in accordance with the provisions of Paragraph 2 of Mr. Murray's letter of March 12, 1943, Pontiac Motor Division has offered to you the open point at Sewickley, Pennsylvania, and you have turned down this offer.

"Inasmuch as Pontiac Motor Division does not currently have other open points available and does not contemplate having any open in the near future, we consider that we have fully complied with our obligation under Mr. Murray's above-mentioned letter of March 12, 1943."

Though the foregoing statement of facts derived from the 655 page record in this case may seem lengthy, the contending attorneys probably will think that we have omitted discussion of quite a bit of evidence which each, respectively, considers material to buttress his argument; but which we do not. Our attempt has been to set out only what we deem to be the salient facts upon which we must decide the issue of whether the District Judge erred in his refusal to direct a verdict in favor of the defendant below, now appellant.

The defendant moved for a directed verdict on several grounds, among others that the evidence offered did not establish or tend to establish a cause of action against it. The District Court took the motion under advisement, and the motion was renewed by the defendant at the conclusion of all the evidence in the case; whereupon the court, after hearing argument and after due deliberation, overruled the motion, stating orally his underlying reasons which are well summarized in the following quotation: "I think that the earlier promises of preferential consideration found in Murray's letter to Keener of March 12, 1943, [identifying exhibit] ripened into a more tangible offer by Bathrick's circular of October 4, 1945, and that plaintiff's responsive letter and application of October 26, 1945, amounted to an acceptance of the offer, subject to the happening of the conditions of availability, or need and availability, and of current requirements later to be determined by the defendant.

"The Bathrick circular of October 4, 1945, invited the plaintiff—it was sent directly to him, it wasn't a circular in the sense that it was just sent to all dealers, it was sent to the dealers by name, and also accompanying it was a receipt to be signed that they had received such invitation—so, to repeat, the Bathrick circular of October 4, 1945, invited the plaintiff to qualify by application, which he did very promptly on October 26, 1945. And the acknowledgment letter of Thompson of November 7, 1945, definitely rejecting consideration of the plaintiff's application so recently filed at the invitation of Bathrick seems to me to call for jury consideration in respect of whether the plaintiff did receive the promised preferential consideration under all the facts and circumstances, and, of course, that would include also the consideration of the question of whether under all the circumstances the defendant's discretion in determining the need of a dealership at the point where plaintiff had previously had one should also be a question of fact as to whether or not that came into existence; and also the question, as to which I am not entirely clear, as to whether the current requirements of the defendant in respect of the dealers at the time, in October 1945, or in early 1946, were such that the plaintiff under the facts and circumstances can be said to have qualified. So it seems to me that there are these questions of fact which warrant the submission of the case to the jury."

In our judgment, the court erred in refusing to grant defendant's motion for a directed verdict, for the reason that the plaintiff had failed to prove that the minds of the parties ever met in a binding legal obligation. To be binding in law, an agreement must be definite and certain. An offer must be so definite in its terms, or

must require such definite terms in the acceptance, that the promises and performances to be rendered by each party are reasonably certain. Restatement of the Law of Contracts, section 32. No person may be subjected by law to a contractual obligation, unless the character of the obligation is definitely fixed by an express or implied agreement of the parties. If the obligation to become binding rests on a future agreement to be reached by the parties, so that either party may refuse to agree, there is no contract. In other words: As long as both parties contemplate that something remains to be done to establish contractual relationship, no contract has been made. It would seem that these principles should be recognized as universally accepted.

From the entire evidence recorded in this case, it is obvious that the parties contemplated the execution in writing of a dealer's selling agreement, should the formal application of Keener Motors, Inc., be acceptable to General Motors Corporation. The net undertaking of General Motors found in its correspondence with Keener was that preferential consideration would be given him if he applied for the renewal of his Pontiac dealership at Youngstown, which had been terminated by mutual consent. The bulletins and correspondence make it clear that appellant retained the right to make final decision in its own discretion as to whether or not it needed Keener's representation in Youngstown, in addition to that given to the prior-in-right dealer, Buckeye, and the associate dealer, Raybuck, a returned soldier also entitled to preferential consideration.

The final decision of General Motors Corporation—reached after obviously careful consideration of Keener's application for renewal of his Pontiac franchise—that it needed no second dealer at Youngstown because of inadequate post-war production constituted, in our judgment, no breach of any enforceable promise made to the appellee. The agreement to give preferential consideration was not a definite undertaking to enter into a contract the terms of which remained to be settled. The settlement of these terms could present difficulties sufficient to thwart a mutually satisfactory agreement. For example, such items as the number and the price of the automobiles to be sold by General Motors to Keener might have presented an insurmountable obstacle to agreement. For many other reasons, it might have been impossible for the parties to agree upon terms.

As to the controlling law of the case, we find no Ohio decision directly in point, but there are certain elucidating Ohio authorities. In P. J. Spitz Co. v. Warner & Swasey Co., 52 N.E.2d 758, 762, 39 O.L.A. 281, Cuyahoga County Court of Appeals, 1945, a contract to employ the services of a real estate broker was held not to be created where there was merely an expression of intention or willingness by the subsequent buyer that if he bought certain property he would buy it through the broker at some future time and would pay his commission established by the Real Estate Board. The court quoted from Volume I, paragraph 25, of Williston on Contracts (Rev.Ed.), as follows: "Since an offer must be a promise, a mere expression of intention or general willingness to do something on the happening of a particular event or in return for something to be received does not amount to an offer." The promise made by the prospective buyer to the real estate broker was closer to a definite promise than the expressions of the various representatives of appellant in the instant case.

In Asbury v. Hugh L. Bates Lodge, 62 Ohio App. 430, 435, 24 N.E.2d 638, 640, Court of Appeals for Butler County, it was held that the acceptance in the circumstances did not establish a binding contract. The Court of Appeals quoted from section 25 of Restatement of the Law of Contracts, as follows: "If from a promise, or manifestation of intention, or from the circumstances existing at the time, the person to whom the promise or manifestation is addressed knows or has reason to know that the person making it does not intend it as an expression of his fixed purpose until he has given a further expression of assent, he has not made an offer." The court then states that "the same lack of a fixed purpose known to the offeror would prevent a manifestation of intent to accept from binding the offeree." Of less authoritative

value, on account of its lesser relevancy, is Woods v. Fifth-Third Union Tr. Co., 54 Ohio App. 303, 6 N.E.2d 987.

The Court of Appeals for Hamilton County held, in The Trent Milling Co. v. Wells-Abbott-Nieman Co., 10 Ohio App. 297, that a contract of exclusive agency for the sale of goods, which is so indefinite in terms as to duration, price and quantity that a court is unable to ascertain the intention of the parties, will not be enforced.

In Gedra v. Dallmer Co., 153 Ohio St. 258, 267, 91 N.E.2d 256, decided March 22, 1950, the Supreme Court of Ohio made it clear that a jury may not properly be permitted to return a verdict based on guess, speculation, or conjecture. True, the case was a tort action; but the same principle would, of course, apply to an action for breach of contract. It was held that the Court of Common Pleas should have instructed a verdict in favor of the defendant.

The opinion of Judge Denison, written for this court many years ago in Horvath v. McCord Radiator & Mfg. Co., 6 Cir., 35 F.2d 640, 642, is helpful here, in that, while the parties there were found to have expressed agreement in principle but fully recognized that there must be further agreement upon details before there was a complete legal obligation, it was held that the case "should be classified with those which deny the existence of an enforceable contract." The decree of the trial court, which was reversed, had concluded that the minds of the parties had met with sufficient definiteness to make an enforceable obligation, requiring the execution of a formal contract relating to the exclusive license of a patent.

Perhaps the closest illustrative authority applying the principle to which we adhere is Ford Motor Co. v. Kirkmyer Motor Co., 4 Cir., 65 F.2d 1001, in which it was held on the facts found that a contract for a dealership in automobiles, not binding the manufacturer to sell or deliver any specified quantity of automobiles and terminable at will, imposed no liability on the manufacturer if he terminated or refused to make sales to the distributor thereunder. The contract was found to be too lacking in mutuality and definiteness to become a binding obligation on the manufacturer. In the course of his opinion, Judge Parker made the following comment: "It appears that plaintiff has been disappointed in its expectations and has been dealt with none too generously by the defendant; but, while we sympathize with its plight, we cannot say from the evidence before us that there has been a breach of binding contract which would enable it to recover damages. While there is a natural impulse to be impatient with a form of contract which places the comparatively helpless dealer at the mercy of the manufacturer, we cannot make contracts for parties or protect them from the provisions of contracts which they have made for themselves. Dealers doubtless accept these one sided contracts because they think that the right to deal in the product of the manufacturer, even on his terms, is valuable to them; but, after they have made such contracts, relying upon the good faith of the manufacturer for the protection which the contracts do not give, they cannot, when they get into trouble, expect the courts to place in the contracts the protection which they themselves have failed to insert." 65 F.2d 1006. Among the cases cited in the court's opinion were Curtiss Candy Co. v. Silberman, 6 Cir., 45 F.2d 451, 452, and Huffman v. Paige-Detroit Motor Co., 8 Cir., 262 F. 116. In the latter case, it was said: "It is quite manifest that the contract merely furnished a basis for future dealings to be observed no longer than was mutually satisfactory. There was no hard and fast commitment of either party, if he chose to break away." 262 F. 117, 118.

This court, in Curtiss Candy Co. v. Silberman, supra [45 F.2d 452], reversed a decree of the District Court on the ground that, while there was undoubtedly a mutual expectation of an indefinite continuance of a manufacturer's exclusive distributorship arrangement with a local jobber, "the contract lacked that mutuality necessary to make it enforceable in so far as executory obligation was concerned." In a recently decided case, Tennessee Enamel Mfg. Company v. Stoves, Inc., 6 Cir., 192 F.2d 863, 868, we found, in reviewing the evidence,

that the alleged commitment which the District Court had held constituted a contract was too vague, hazy and nebulous to form a solid foundation for contractual liability; and reversed the judgment. We cited with approval Curtiss Candy Co. v. Silberman, supra, and pointed out that we had there held that an alleged contract between a manufacturer of candy and local jobbers for the distribution of its products was unenforceable for lack of mutuality. We said: "In that case, the salesman of the manufacturer had promised jobbers exclusive distribution privileges and accepted orders accordingly; and the jobbers subsequently had obtained confirmation of the arrangement from the manufacturer. The parties, however, had not reached a definite agreement concerning prices, terms, etc., nor had they come to any definite agreement binding the manufacturer to furnish in the future or the jobbers to buy any specific quantity of candy, or to maintain contractual relationship for any definite period of time."

In Motor Car Supply Co. v. General Household Utilities Co., 4 Cir., 80 F.2d 167, 170, Judge Parker again wrote upon the present subject matter: "The law is well settled that, where a contract for the future delivery of personal property confers upon either party an arbitrary right of cancellation prior to delivery, it is lacking in mutuality and will be held binding upon the parties only to the extent that it has been performed. [Citing cases.] And, with respect to distributor's contracts, like that here under consideration, it is equally well settled that such a contract, which does not bind the manufacturer to sell and deliver, and which is terminable at will, imposes no liability upon him if he terminates it or refuses to make deliveries to the dealer." The following authorities were cited: Ford Motor Co. v. Kirkmyer, supra; Huffman v. Paige-Detroit Motor Co., supra; Curtiss Candy Co. v. Silberman, supra; Jordan v. Buick Motor Co., 7 Cir., 75 F.2d 447; E. I. DuPont De Nemours & Co. v. Claiborne-Reno Co., 8 Cir., 64 F.2d 224, 89 A.L. R. 238; Nebraska Aircraft Corporation v. Varney, 8 Cir., 282 F. 608; Studebaker

Corporation of America v. Wilson, 3 Cir., 247 F. 403; Oakland Motor Car Co. v. Indiana Automobile Co., 7 Cir., 201 F. 499; Velie Motor Car Co. v. Kopmeier Motor Car Co., 7 Cir., 194 F. 324.

In Jordan v. Buick Motor Co., supra, an agreement of a manufacturer of automobiles to give a dealer an exclusive agency for a certain territory, provided the dealer should acquire $40,000 additional capital, was held unenforceable as a contract for indefiniteness, where the agreement did not fix a time for the exclusive agency contract or fix the prices or number of cars to be handled or the time and manner of their delivery. Judge Evans cited authorities and declared: "The weight of authority seems to be strongly against appellants' contention that the agreement was sufficiently specific to be upheld. We are unable to escape the rule which these decisions announce and apply." 75 F.2d 450.

In Bushwick-Decatur Motors v. Ford Motor Co., D.C.E.D.N.Y., 30 F.Supp. 917, 924, the District Court held in a well presented opinion that an alleged oral agreement of an automobile manufacturer that a more profitable territory would be allocated to one of its dealers whenever available was too indefinite, vague and uncertain to constitute an enforceable contract.

See also the opinion of Judge Phillips in Brooks v. Sinclair Refining Co., 10 Cir., 139 F.2d 746, 747, wherein an agency contract, so far as it was executory, was found to be "wholly illusory" and it was held that its termination imposed no liability upon the principal who terminated it.

Applying the principles of decision expounded in the authorities which have been discussed to the facts of the instant case, viewed in the light most favorable to the plaintiff below, Keener Motors, Inc., it is our inescapable conclusion that the District Judge should have granted the motion for a directed verdict made by appellant, General Motors Corporation, at the conclusion of all the evidence in the case.

Accordingly, the judgment of the District Court is reversed; and the case is ordered to be dismissed at the cost of appellee.