Harry ASHTON (formerly known as Harry Asciutto or Harry Ash), Vincent J. Di Costa and Frank Bages, Plaintiffs,

v.

CHRYSLER CORPORATION, Defendant.

Civ. A. No. 61–C–362.

United States District Court
E. D. New York.

May 25, 1965.

Harry J. Elarde, Brooklyn, N. Y., for plaintiffs, Gerard M. Carey, of counsel.

Kelley, Drye, Newhall, Maginnes & Warren, for defendant, Robert Ehrenbard, John J. Loflin, Jr., New York City, Keith A. Jenkins, Detroit, Mich., Kenneth L. Stein, New York City, of counsel.

MISHLER, District Judge.

Plaintiffs state three claims arising out of the failure to consummate a Dodge-Plymouth dealership at Wrightstown, New Jersey.

The first claim is based upon the wrongful refusal "to grant the plaintiffs the agency as promised and agreed upon" (par. Sixth); the second claim is based upon a false and fraudulent statement that Wrightstown "was not to be classified as an open point" (par. Eleventh); the third claim is based upon the negligent and careless representation that Wrightstown "was an open point * * when later said defendant declared that it was not an open point" (par. Fifteenth).[1]

## FACTS

On January 24, 1957, plaintiff, Harry Ashton, as Vice President of Dix-McGuire Motors, Inc., executed an "Application For Sales Agreement" together with other supporting papers—all being forms composed by defendant and customarily used by its applicants for dealerships—characterized as an application package. Dix-McGuire Motors, Inc. was organized by plaintiffs for the purpose of entering into a sales agreement with defendant granting a franchise for the sale of Dodge and Plymouth motor vehicles and service of the same. The application provided as follows:

IT IS UNDERSTOOD that this application is not binding upon us nor does it obligate the Chrysler Corp., in any way to enter into a Dodge-Dodge Truck Plymouth Agreement with us. Any options on real estate or investments of any kind made by us in contemplation of the acceptance of this application are done solely on our own responsibility and do not obligate the Chrysler Corp., or any of its representatives in any way.

IT IS ALSO UNDERSTOOD that the execution of a Dodge-Dodge Truck Plymouth Agreement between the Chrysler Corp., and us is the only manner by which the Chrysler Corp. may accept this application. We admit that no representations or statements have been made to us in behalf of the Chrysler Corp., which would in any way tend to change or to modify the terms of this application. (Ex. 3)

On January 25, 1957, a proposed sales agreement was executed by Dix-McGuire Motors, Inc. which by its terms express-

---

1. Plaintiffs' trial memorandum (p. 1) states its claims and theories as follows: " * * * breach of contract, of an oral, unilateral agreement to give plaintiffs a Dodge Plymouth dealership in Wrightstown, New Jersey, upon meeting specified conditions; constructive fraud in that defendants' [sic] authorized personnel misrepresented a material basic fact, namely, that Wrights-town was a designated open point, upon which plaintiffs reasonably relied, to their detriment and damage; actual common law fraud on the grounds that the misrepresentation of the above-mentioned material fact was recklessly made, without due regard to available information at the disposal of the defendants' [sic] personnel who made the false representation."

ly provided that the agreement was not effective unless signed by a duly authorized officer at defendant's principal office in Detroit, Michigan.

Plaintiffs then advised defendant, at its zone office in Philadelphia, that the proposed location was changed. A new proposed sales agreement, showing the change in location of the plaintiffs' business, was executed on February 6th. It duplicated *mutatis mutandis* the agreement originally executed by plaintiffs and to be executed by a duly authorized officer of defendant.

Plaintiffs deposited $30,000 in a corporated bank account as required by the terms of application package (Ex. 6, 39). Dix-McGuire Motors, Inc. entered into an agreement for the purchase of property in which the corporate business was to be conducted. A wholesale line of credit was not obtained until March 1, 1957 (Ex. 7, 41).

The application eventually won approval from the zone and regional offices in Philadelphia and the eastern area office in New York. When it was received in Detroit, a market study was made. During this study, defendant's representative, Ray C. Ayer, had occasion to view the proposed facilities for the Wrightstown dealership and to interview plaintiffs. His report disapproved the dealership in Wrightstown and the proposed location. He orally reported to Arthur Nielsen, vice-president of defendant, his disapproval of plaintiffs' proposed corporate structure and business enterprise. Based upon this report, Mr. Nielsen, vested with authority to grant or decline the application for the franchise, chose to decline it.

Subsequently, at plaintiffs' insistence, a newly appointed regional manager of defendant's Philadelphia office, James R. Jarvis, gave plaintiffs a letter stating that the application had been denied because Wrightstown was not an "open point."

The complaint, however, is founded upon events that transpired prior to plaintiffs execution of the application package. Plaintiffs rely upon statements made, and acts performed, by the following representatives of defendant:

Howard W. Bradberry, dealer planning and placement manager in the Philadelphia zone office—1956–1958.

Charles J. Kelchner, regional assistant new car and truck manager in the Philadelphia office—1956–May 1960.

Charlie M. Keller, regional sales manager for Dodge Division in the Philadelphia office—1956–April 1957.

James R. Jarvis, regional manager for Dodge and Plymouth Divisions in the Philadelphia office from April 15, 1957.

Ray C. Ayer, manager of market research department for Chrysler Motors Corp.—1957.

Arthur H. Nielsen,—vice-president of Chrysler Motors Corporation—1957.

Plaintiffs were employed in managerial positions by Marathon Motors, Inc., Brooklyn, New York, during the years 1954 through 1956. Howard Bradberry, in 1954, was district manager for Plymouth Motor Division of Chrysler Motors Corp. in Brooklyn, New York. During the course of this employment, Bradberry met the plaintiff Bages; they had frequent business and social contacts during 1954–1955. In June 1956, Bages became interested in Wrightstown as a location for the operation of a new car dealership. Bages then contacted Bradberry, who by that time had been transferred to the Philadelphia zone office, and outlined his ideas concerning a proposed dealership in Wrightstown.

Bradberry, in November of 1956, telephoned Bages to tell him that Wrightstown was an "open point." [2] During the

---

2. The term "open point" was defined by Charlie M. Keller as " * * * a point where there was no representation" or where the district or regional office believed it should have a dealership (Trans. p. 1017, l. 12–17).

A "designated open point" is one that has been determined by "top management" after survey and consideration to be an area in which sales representation is advantageous to Chrysler. (Keller-Trans. p. 1030, l. 12 to p. 1031, l. 5).

course of this conversation he also explained some of the preliminary requirements Bages would have to meet to qualify. Bages in turn replied that the dealership would be too big for him to handle alone and he mentioned Ashton, who was familiar to Bradberry due to Ashton's association with Marathon Motors, Inc., when it was a DeSoto-Plymouth dealer, as a possible business associate. Thereafter, Bages, Ashton and Bradberry met at Hamilton House in Bay Ridge, Brooklyn. They discussed the possibility of establishing a Dodge-Plymouth dealership in Wrightstown, a point, according to Bradberry, declared to be "Open" by defendant. Bradberry advised them that he would arrange for a meeting with other representatives of defendant at which time the requirements for a dealership in Wrightstown would be more specifically discussed.

In late December of 1956, plaintiffs met with Bradberry, Keller and Kelchner at the Waldorf-Astoria in New York City. It was explained to plaintiffs that they must comply with certain requirements before they could be considered for a franchise, i. e., suitable premises, capital requirements, business organization, wholesale line of credit. Plaintiffs explained their qualifications to Keller and Kelchner, whom they had just met, and set forth the manner in which they proposed to carry on the dealership when obtained. In reply to a question posed by Ashton, Keller expressly declared that Wrightstown was an "open point." The meeting terminated and, on Ashton's invitation, a further meeting was arranged for the following Sunday at Wrightstown.

Plaintiffs met, in Wrightstown, with Keller and Kelchner as planned; Bradberry was not present. The group toured the area of proposed penetration, i. e., Fort Dix, McGuire Air Force Base, and the adjoining regions, and they investigated dealership facilities available in Wrightstown. Plaintiffs were again assured that Wrightstown was an open point and the requirements for a dealership were more specifically set forth.

While an air of optimism on the part of both defendant's representatives and plaintiffs pervaded the meeting, Kelchner also cautioned plaintiffs that the franchise was only pending and that the representatives present could make no binding commitments to them. The meeting terminated with the understanding that plaintiffs were to come to the Philadelphia regional office to formalize their application. Prior to the Philadelphia meeting, plaintiffs submitted a prospectus that presented data with respect to the principals, proposed facilities, capital available and other information relevant to their goal of the award of a dealership franchise.

Subsequently, plaintiffs went to the Philadelphia office to prepare their application package. Keller and Kelchner met them and aided in preparation of the necessary documents. Various papers constituting the application package were signed in the name of Dix-McGuire Motors, Inc., a corporation then in the process of organization.

Two documents are particularly relevant to the issues here involved. The first document completed and signed was titled "Application for Sales Agreement". (Ex. 3) It was read to plaintiffs by Kelchner; he filled in the blank spaces as the information required was provided by plaintiffs. The application was signed by Ashton, as vice-president of Dix-McGuire Motors, Inc. The other document here relevant, including the Sales Agreement, was likewise prepared and signed by Ashton in the name of the corporation. That document, as with all the others constituting the application package, was read and explained to plaintiffs. At this time, it was noted that this document must also be executed by a duly authorized officer of defendant for it to become effective. It was further explained that the application package, as prepared, would be processed from the regional and zone office in Philadelphia, to the eastern area office in New York City, and ultimately to Detroit, from whence must come the final approval. Plaintiffs fully under-

stood the procedure to be followed. They were cautioned that 90% of the applications receive final approval in Detroit and that they would be ill-advised to make large expenditures until receipt of the executed sales agreement.

Plaintiffs were unable to obtain the premises described in the Sales Agreement and a new location was found. Accordingly, on February 6, 1957, a new Sales Agreement was signed to reflect the change in the premises and the prior Sales Agreement was destroyed. The procedure followed for the signing of documents at the previous meeting was again followed.

It is not necessary to discuss, in detail, events occurring subsequent to February 6, 1957; it is at this point that the application package was completed and ready to be processed.

Plaintiffs first claim is based upon the theory that defendant breached an oral unilateral contract made prior to the signing of the documents comprising the application package. The portions of the "Application for Sales Agreement" hereinabove referred to expressly provides that the application is not binding on either party and that it obligates neither. It further provides that the sales agreement must be executed by defendant in order for the application to be accepted and the franchise awarded. The application was read to, and understood by, plaintiffs. Thus, the parties contemplated that the execution of the sales agreement by both Dix-McGuire Motors, Inc. and defendant would be the only way in which the franchise could be awarded to plaintiffs. An oral contract cannot be formed prior to the execution of a written agreement when it is the clear intention of the parties that the contract is to be reduced to writing before becoming effective. Banking & Trading Corp. v. Floete, 1958, 2d Cir., 257 F.2d 765; General Motors Corp. v. Keener Motors, Inc., 1952, 6th Cir., 194 F.2d 669; 1 Williston, Contracts §§ 28, 28a (3d ed. 1957). Even assuming that an oral unilateral contract was within the contemplation of the parties, such agreement was not consummated prior to February 6, 1957 since plaintiffs did not obtain the required wholesale line of credit until sometime in March of 1957. In any event, plaintiffs knew that the ultimate approval of Chrysler Motors Corp. was required; that this approval could be rendered only in the Detroit office of defendant; and that events occurring prior thereto were merely preparatory to obtaining approval. It was carefully explained that the only persons who had authority to sign the sales agreement were specified officers of the corporation in Detroit; that plaintiffs knew this to be true is evidenced not only by the careful explanation previously referred to but, further, by the fact that Ashton subsequently journeyed to Detroit to see Arthur H. Nielsen, a vice-president of defendant, who he knew to be the officer who would approve or disapprove the application. Thus, on any view of the facts, it is clear that there existed no oral unilateral contract to give plaintiffs a Dodge-Plymouth dealership in Wrightstown.

Plaintiffs second and third claims have their basis in statements made to them by representatives of defendant; the second claim alleges fraud or deceit; the third claim charges negligent misrepresentation.

To prove deceit in a business transaction the plaintiffs must show: (1) defendant made a material misrepresentation of fact; (2) scienter on part of defendant; (3) intent to induce plaintiffs to act in reliance thereon; (4) plaintiffs' reliance was justifiable; and (5) damage was caused thereby. Prosser, Torts 700 (3d ed. 1964); Restatement, Torts § 525 (1938). Plaintiffs, therefore, must establish first that a misrepresentation was made, i. e., that defendant knew or believed the matter to be other than as represented or that defendant knew that it lacked adequate basis for the assertion made. Restatement, Torts § 526 (1938). The import of the statements made can be understood only after consideration of plaintiffs'

background and experience in the retail automobile business. The evidence is clear, and undisputed, that plaintiffs had many years of experience in various phases of that business; plaintiffs had also made previous efforts to obtain retail automobile franchises. Ashton had attempted to obtain a new car franchise as early as 1938 and subsequently made other attempts; and as late as February 15, 1956, plaintiffs submitted an "Application for Plymouth Direct Dealer Sales Agreement". (Ex. 1) Plaintiffs were repeatedly cautioned as to the authority of the representatives of defendant with whom they dealt and they acted accordingly. The most cogent evidence of this is Ashton's trip to Detroit to see Nielsen, discussed above. Moreover, plaintiffs knew of the channels through which their application must pass before final approval could be rendered and that there was a chance, albeit a small one, that it would be disapproved; defendant went even further and cautioned plaintiffs to limit their expenditures until the sales agreement was signed. The representation that Wrightstown was an "open point" is not here material for defendant had no duty to award the franchise to plaintiffs by virtue of that fact alone; that plaintiffs were well aware of defendant's existing freedom of choice with respect to their application as witnessed from their knowledge of the procedures involved before an application could be approved, from the care with which all representations were made to them, and from their knowledge of the limited authority of the representatives of defendant with whom they dealt. It is thus clear that the representations made were not fraudulent and that plaintiffs reliance thereon was not justified.

■■ To prove that a representation was negligently made the plaintiffs must prove, in essence, that defendant failed to exercise reasonable care in making the representations referred to. Ultramares Corp. v. Touche, 1931, 255 N.Y. 170, 174 N.E. 441, 74 A.L.R. 1139; Prosser, Torts 719–20 (3d ed. 1964); Restatement, Torts § 552 (1938). The facts discussed above obviate the need for discussion of plaintiffs third claim. It is clear that all representations made by defendant's representatives were made with the care exercised by the reasonably prudent man.

■■ Plaintiffs also seek recovery based upon a theory of constructive trust. Constructive trust is a procedural device employed by courts of equity to prevent unjust enrichment, Harrington v. Emmerman, 1950, 88 U.S.App.D.C. 23, 186 F.2d 757; it cannot serve as the basis for a substantive claim or right. New Amsterdam Casualty Co. v. Waller, 1962, 4th Cir., 301 F.2d 839. Since plaintiffs have failed to prove that there exists a right or claim in their favor, this Court finds argument based upon the theory of constructive trust inappropriately raised. See 4 Scott, Trusts § 462 (2d ed. 1956).

The most that plaintiffs can complain of under the circumstances of the instant case is that they failed to consummate a promising business transaction: "disappointed hopes are not the basis of legal liability." Adams v. Clark, 1925, 239 N.Y. 403, 146 N.E. 642.

Findings of fact and conclusions of law have been made and filed simultaneously herewith.

The Clerk is directed to enter judgment in favor of the defendant and against the plaintiffs dismissing the complaint herein.