AMERICAN NURSING CARE OF TOLEDO, INC., et al., Plaintiffs,

v.

Edward D. LEISURE, et al., Defendants.

AMERICAN NURSING CARE OF COLUMBUS, INC., et al., Plaintiffs,

v.

Edward D. LEISURE, et al., Defendants.

ACME HEALTH SERVICES, INC., et al., Plaintiffs,

v.

Edward D. LEISURE, et al., Defendants.

Nos. C 83–972, C 83–1060 and C 83–1135.

United States District Court, N.D. Ohio, W.D.

Nov. 15, 1984.

Kenneth J. White, Spengler, Nathanson, Heyman, McCarthy & Durfee, Toledo, Ohio, for plaintiffs.

David F. Cooper, Eastman & Smith, Toledo, Ohio, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN W. POTTER, District Judge.

The plaintiffs and the defendants in the three consolidated cases which make up this action are former franchisees of a temporary health care franchisor, Nursing Staff, Inc., a Maryland corporation. Three lawsuits were filed in the fall of 1983 against defendants Edward D. Leisure and American Nursing Care, Inc. The Court consolidated the three causes by orders of December 15, 1983 and December 27, 1983.

Plaintiffs in No. C 83–972 (sometimes hereinafter the Toledo case) are American Nursing Care of Toledo, Inc. (now called ABC Health Care, Inc.) and its two fifty

percent shareholders, Jagdish U. Patel and his cousin Ghanshyan G. Patel; plaintiffs in No. C 83–1060 (sometimes hereinafter the Columbus case) are American Nursing Care of Columbus, Inc. (now called A–1 Nursing Care, Inc.) and its president and fifty percent shareholder, Naresh N. Patel; plaintiffs in No. C 83–1135 (sometimes hereinafter the Dayton case) are Acme Health Services, Inc. (formerly American Nursing Care, Inc. of Dayton) and its president and forty percent shareholder, Jagdish P. Patel.

The occurrences out of which these lawsuits arose are related to attempts of defendant Edward D. Leisure (Leisure) and the Patels, all of whom are immigrants from India and some of whom are relatives and long term acquaintances, to organize a new franchisor corporation after Leisure, through American Nursing Care, Inc., had purchased the franchises of Toledo, Columbus and Dayton, as well as his own franchise in Cincinnati, from Nursing Staff, Inc. This purchase was part of the settlement of a lawsuit in which Nursing Staff, Inc. sued Leisure in 1982.

To simplify somewhat the positions of the parties, plaintiffs assert that the above mentioned franchise agreements (in the Columbus case, an agreement signed in April, 1983) were terminated and were replaced by a detailed oral agreement which defendants breached by, *inter alia*, failing to provide the plaintiffs with stock in American Nursing Care, Inc. Defendants deny that there was an oral agreement, although admitting that protracted negotiations among the parties occurred, and assert that the written franchise agreements remain in effect.

In their complaints in each case, the plaintiffs assert that defendants violated the following federal statutes: the Securities Act of 1933, 15 U.S.C. § 77a *et seq.* (Counts III and IV of all complaints); the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (Count V of all complaints); the Racketeer-Influenced and Corrupt Practices Act, 18 U.S.C. § 1961 *et seq.* (Count VI of all complaints). Plaintiffs

also assert the following pendent state law claims: common law fraud (Count I, No. C 83–972 and No. C 83–1060); breach of contract (Count II, No. C 83–972 and No. C 83–1060; Count I, No. C 83–1135; breach of oral agreement (Count I, No. C 83–1135, Count IX, No. C 83–972); violation of Ohio's Blue Sky Law, Ohio Revised Code § 1707.01 (Count VIII, No. C 83–972; Count VII, No. C 83–1060, No. C 83–1135). Plaintiffs in No. C 83–972 also assert that defendants violated the Ohio Business Opportunity Purchaser's Protection Act, Ohio Revised Code Chapter 1334.01(D) (Count VII).

Defendants assert counterclaims in all three causes. In Case Nos. C 83–972 and C 83–1135, defendants seek enforcement of the licensing agreements (franchise contracts) between the plaintiffs and Nursing Staff, Inc. as well as monetary relief in the form of damages. In Case No. C 83–1060, defendants seek enforcement of a franchise agreement entered into by Naresh Patel on April 12, 1983 as well as monetary damages.

Defendants also filed third party complaints against Jagdish P. Patel in Case Nos. C 83–972 and C 83–1060 asserting that he is liable over to defendants should they be found liable on Count I (common law fraud) of the respective complaints.

In No. C 83–972 two hearings on motions for temporary restraining orders were held and two TROs were granted. By agreement of the parties, these orders of the Court regarding the operation of the parties' businesses remain in effect until the Court makes its determination on the merits. An agreed order regarding operation of the businesses remains in effect in No. C 83–1060 pending final disposition of this cause, as is an order regarding the manner in which A–1 Nursing Care (Columbus) is to answer incoming telephone calls.

The parties submitted trial briefs and proposed findings of fact and conclusions of law. A preliminary injunction hearing was begun on November 22, 1983. Trial on the merits was advanced and consolidated with the preliminary injunction hearing.

Fed.R.Civ.P. 65(a)(2). The cause was heard by the Court on January 5, 6, 13, 17, 18, 19 and February 21, 22, 23, 24, 28, 29 and March 1, 1984.

At the end of plaintiffs' case, the Court granted motions under Fed.R.Civ.P. 41(b), dismissing Counts I, II and VII in the Toledo case (No. C 83–972) and Count I in the Dayton case (No. C 83–1135). Motions to dismiss the remaining counts in all cases were denied at that time and at the end of all evidence.

All parties filed post-trial briefs and revised findings of fact and conclusions of law. Plaintiffs filed supplemental proposed findings of fact and conclusions of law. Plaintiffs also filed an answer to defendants' post-trial brief and a post-trial reply in opposition to defendants' counterclaim. Defendants filed a post-trial reply brief. Defendants also filed a supplemental post-trial memorandum to which plaintiffs responded. The Court has considered all of the above and has made its own independent determinations.

*Findings of Fact*

Plaintiff American Nursing Care of Toledo, Inc., since October 25, 1983 known as ABC Health Care, Inc. (hereinafter ABC) is an Ohio corporation with its principal place of business in Toledo, Ohio. It is in the business of providing temporary nursing services in the Toledo metropolitan area. Until June, 1983, plaintiff ABC was known as Nursing Staff of Toledo, Inc.

Plaintiff Jagdish U. Patel (hereinafter J.U. Patel) is the president of ABC and a fifty percent shareholder in that company. J.U. Patel is a resident of the State of Ohio. Plaintiff Ghanshyam Patel (hereinafter G. Patel) is a fifty percent shareholder in ABC and is the cousin of J.U. Patel. G. Patel is a resident of the State of Ohio.

Plaintiff American Nursing Care of Columbus, Inc., since November 19, 1983 known as A–1 Nursing Care, Inc. (hereinafter A–1), is an Ohio corporation with its principal place of business in Columbus, Ohio. It is in the business of providing temporary nursing services in the Colum-

bus metropolitan area. Prior to the time it became American Nursing Care of Columbus, Inc., plaintiff A–1 was known as Nursing Staff of Columbus, Inc.

Plaintiff Naresh Patel (hereinafter N. Patel) is the president of A–1 and holds fifty percent of the shares of that company. N. Patel is a resident of the State of Ohio. N. Patel is not related to any of the other litigants.

Plaintiff Acme Health Care Services, Inc. (hereinafter Acme) is an Ohio corporation with its principal place of business in Dayton, Ohio. It is in the business of providing temporary nursing services in the Dayton area. Acme was, until December 15, 1983, known as American Nursing Care of Dayton, Inc. and, prior to that, as Nursing Staff of Dayton, Inc.

Plaintiff Jagdish P. Patel (hereinafter J.P. Patel) is a principal shareholder and chief executive officer of Acme. He is a resident of the State of Ohio.

Defendant American Nursing Care, Inc. (hereinafter ANC), is an Ohio corporation with its principal place of business in Cincinnati, Ohio. It was established to act as a franchisor of temporary nursing service businesses.

Defendant Edward Leisure (hereinafter Leisure) is the controlling shareholder and chief executive officer of ANC, and is a resident of the State of Ohio.

In 1976, Leisure became a franchisee of Nursing Staff, Inc. (hereinafter NSI). NSI is a Maryland corporation with its principal place of business in Fairfax, Virginia. NSI was in the business of franchising offices which provided temporary nursing care services. One of the principals of NSI, Robert Bainum, is a cousin of Leisure.

In 1976, Leisure opened his first Nursing Staff office in Cincinnati, Ohio (NS Cinci.) and was its one hundred percent shareholder. He conducted this business pursuant to a written franchise and licensing agreement with Nursing Staff, Inc. Prior to the time Leisure became a Nursing Staff fran-

chisee in 1976, he had had no previous experience in the health care field.

Since December 1, 1982, NS Cinci. has been known as American Nursing Care of Cincinnati, Inc. (ANC Cinci).

Leisure had an agreement with NSI under which he would receive a percentage of the monthly franchise fees paid by any new franchisee of NSI whom Leisure would recruit and assist.

The first franchisee recruited by Leisure was J.P. Patel. Leisure and J.P. Patel met in 1976 when Leisure leased office space for NS Cinci. in a building owned by J.P. Patel. In 1978, Leisure and J.P. Patel discussed the possibility of J.P. Patel opening a Nursing Staff office in Dayton. This office was opened in September, 1978. A license agreement, which provided for monthly payment of franchise fees at 3% of gross receipts billed and collected was signed on October 26, 1978 (DX 56). Leisure was to receive one-third of this fee in consideration of his providing training and support. Leisure gave J.P. Patel aid and assistance in establishing the Dayton franchise.

Leisure and J.P. Patel became close personal friends and became associates in two other business ventures. Both men were, for a time, members of the NSI Board of Directors.

In early 1981 J.P. Patel put Leisure in touch with G. Patel, another Indian immigrant whom J.P. Patel had known for a number of years. Leisure and J.P. Patel met with G. Patel, but G. Patel did not become a Nursing Staff franchisee at that time.

Later, in the Spring of 1981, J.U. Patel, a cousin of G. Patel, met with J.P. Patel and Leisure in Toledo to discuss J.U. Patel's becoming a Nursing Staff franchisee. J.U. Patel and J.P. Patel first met in 1979 or 1980. G. Patel believed a temporary nursing care franchise would be a good business opportunity for J.U. Patel.

During the Toledo meeting, Leisure, in J.P. Patel's presence, explained the temporary nursing care business to J.U. Patel.

The three men visited several temporary health care businesses already in operation in Toledo. Thereafter, when J.U. Patel decided to become a NSI franchisee, Leisure returned to Toledo to help J.U. Patel lease office space.

G. Patel lent J.U. Patel $15,000 to invest in the business and received 50% of the stock of the Toledo franchise.

The franchise began operation in April, 1981. A license agreement was executed June 2, 1981 (PX 1). It provides for payment of monthly fees at 3% of all accounts billed and/or collected. For having located the new franchisee, J.P. Patel and Leisure each were to receive a percentage of these fees. J.P. Patel was to receive 1% and Leisure ½% of the fees. In exchange they were to provide the necessary training and support for start-up and operations. Once the business was underway, advice was to be given on an as-requested basis. J.P. Patel and Leisure did provide some training and some support, most in the form of common sense advice. J.P. Patel also provided loans to J.U. Patel when J.U. Patel experienced cash flow problems.

In August, 1981 G. Patel formed a corporation known as Nursing Staff of Columbus, Inc. The Columbus license agreement was executed in December, 1981 (PX 14). J.P. Patel, J.U. Patel and Leisure were to receive a portion of the monthly 3% franchise fees which the Columbus franchise was obligated to pay. G. Patel later transferred 50% of the stock in the Columbus franchise to J.U. Patel.

In late 1982, G. and J.U. Patel contracted to sell the Columbus franchise to N. and Saroj Patel for approximately $115,000. G. Patel told N. Patel that the relationship between the Columbus franchise and NSI was satisfactory. He made representations regarding potential profits similar to those which Leisure had earlier made to him. J.U. Patel had been an acquaintance of N. Patel in India. J.U. Patel and G. Patel provided N. Patel with training and assistance in the business.

In connection with the consummation of the sale of the Columbus franchise to N. Patel, G. Patel signed, with N. Patel's approval, a new franchise agreement with NSI on November 2, 1982 (PX 15). The agreement provided for monthly 3% franchise fees.

In late spring of 1982, NSI sought to terminate the franchise and license of N.S. Cinci. and filed a lawsuit seeking damages and specific enforcement of certain provisions of the agreement. In response, N.S. Cinci. and Leisure filed a counterclaim and prepared to do business under the name American Nursing Care and to set up a new franchise system in that name.

During the pendency of that lawsuit, Leisure suggested that the other franchisees not pay their franchise fees to NSI. He stated that he was entitled to a portion of these fees. In response, plaintiffs told Leisure that they intended to observe the NSI contracts.

To resolve the lawsuit, Leisure entered into an agreement to purchase his own franchise contract and that of the plaintiffs. He used American Nursing Care (ANC) to purchase these rights and act as the new corporate franchisor. ANC had been previously organized but dormant. NSI continued to exist as a separate corporate entity.

The purchase of these rights was consummated in early 1983. The franchisees were formally notified of the change. Each franchisee was provided new forms and advertising materials at ANC's cost and began operating as American Nursing Care. ANC also financed the production of a television commercial and made it available for the use of the franchisees.

There were extensive discussions among Leisure and the Patels regarding the division of ownership interests of ANC and related matters. However, these discussions never reached the state of a definitive or enforceable agreement. All parties understood that a fair price would be paid for equity interests, but the parties never proceeded to the point of setting a definitive price or number of shares. In the discus-

sions about the contemplated ownership of ANC and related matters, J.P. Patel assumed the role as spokesman for other franchisees. The franchisees were represented by counsel through these discussions.

Of all the witnesses in the lengthy trial in this matter, the Court found most credible the testimony of Michael Steding; he was a disinterested and straightforward witness. Steding, a certified public accountant, has done accounting work for all the parties to this litigation and is presently the accountant of Leisure and J.P. Patel. He was present on a number of occasions when Leisure, the Patels and others interested in the new corporation discussed the ownership and management of the new company, and possible terms of the new agreements. The thrust of Steding's testimony was that a new written franchise agreement was contemplated and was to be signed by all franchisees but that there was never a meeting of the minds among the parties as to its terms.

■ The Court finds that there existed no detailed oral contract as plaintiffs assert. The various aspects of the alleged oral agreement were but potential terms to be embodied in new franchise agreements or potential changes which were predicated upon the signing of new franchise agreements. There was no oral agreement sufficiently definite for the Court to conclude that a valid and enforceable contract was entered into among the parties.

On April 12, 1983, N. Patel signed a new franchise agreement on behalf of Columbus with ANC (PX 16). J.P. Patel, in the presence of J.U. Patel and Leisure, told N. Patel that J.P. Patel would sign the agreement on behalf of Dayton. J.P. Patel and Leisure had delivered the franchise agreement to N. Patel for examination at least two weeks prior to the date on which N. Patel signed. This contract calls for the payment of fees at the rate of 2%.

■ Because of irreconcilable differences, the parties were not able to proceed with their mutual desire to own and oper-

ate ANC on a joint basis. Leisure decided to proceed with ANC on his own with other associates.

The plaintiffs have alleged that the defendants had agreed to issue certain percentages of stock of ANC in exchange for executing a guarantee and doing business in the name of American Nursing Care. After reviewing all of the evidence herein, the Court finds that there was no such oral or express agreement. The acts taken by the plaintiffs were not part of a contractual quid pro quo but were some isolated aspects of a mutual attempt to create a jointly owned and operated franchising company. The fact that the parties were unable to create such a company does not indicate that there was a breach of any oral contract.

Each franchise agreement contains certain notice and cure provisions in the event of default and/or termination pursuant to the contract. Each of the franchisees unilaterally renounced its obligations under the contract by changing its name and filing suit without giving prior notice to the defendants.

Each of the franchisees continues to do business in its respective market area.

Each franchisee continues to use the same telephone number as it used while doing business as an ANC franchisee. As a result, each is still using the number that is listed in the 1983 telephone directories under the name of American Nursing Care. Each listing also gives the same business address as was used as an ANC franchisee. Each of those advertisements identify the former Nursing Staff franchise connection.

The four individual plaintiffs are well educated and fluent in the English language. J.U. Patel holds a degree in mechanical engineering from an American university. G. Patel and J.P. Patel hold Master's degrees in Business Administration from universities in this country. N. Patel has a degree in dentistry from an Indian university and was in business in London, England for ten years before coming to this country. All of the Patels are knowledgeable in business matters.

*Conclusions of Law*

This Court has jurisdiction over the claims of plaintiffs relating to the violations of the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.*, under § 77b. This Court has jurisdiction over the claims of plaintiffs relating to violations of the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*, under § 78aa. This Court has jurisdiction over the claims of plaintiffs relating to violations of the Racketeer-Influenced & Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*, under § 1967 of that Act.

■ This Court has pendent jurisdiction over plaintiffs' state law claims because the state law claims derive from a common nucleus of operative facts with the securities and racketeering claims and the plaintiffs would ordinarily expect to try them all in one judicial proceeding. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

■ The law governing the pendent claims between plaintiffs and defendants is that of the State of Ohio since all plaintiffs and defendants are Ohio residents or corporations. *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

■ The Toledo plaintiffs were not induced by fraud to execute the franchise agreement (Count I, Complaint, Case No. C 83–972). The alleged representations of Leisure were all accurately based on the operating experiences of his company. There was no scienter or intent to deceive. Furthermore, the statements were substantially accurate. Even if the results in Toledo turned out differently than expected, this does not indicate fraud. 50 O.Jur.3d, *Fraud and Deceit* §§ 22–25, 40–41. Also, the Court finds that G. and J.U. Patel did not rely primarily on the statements of Leisure but rather on those of J.P. Patel.

■ Further, the Toledo plaintiffs' subsequent conduct bars any recovery of damages or any right to rescind or terminate the contract. The plaintiffs discovered the

alleged falsity of the representations within the first year of operations. Yet they formally executed the contract two months after start-up and continued to adhere to the contract for two and one-half years before attempting to renounce it on the basis of fraud. Eight months after beginning to operate they opened a second franchise in Columbus and thereafter sold the operating company to N. Patel for a substantial profit. The conduct is inconsistent with the plaintiffs having been defrauded. It further constitutes waiver and ratification of the fraud and eliminates any claim of such fraud. 51 O.Jur.3d, *Fraud and Deceit* §§ 205–209.

■ The Toledo and Dayton plaintiffs have alleged an extremely detailed oral agreement (Count IX, second amended complaint, C 83–972; Count II, C 83–1135), whereby, in consideration of execution by J.P., J.U. and G. Patel of guarantees of a $100,000.00 loan and of new franchise agreements with ANC, identical to their Nursing Staff agreements (except at a one-third lower franchise fee rate), ANC would forgive franchise fees accrued prior to December 1, 1982, would reduce the fees to 2%, would give J.P. Patel 30% of the stock of ANC and 5% each to J.U. Patel and G. Patel, and make each a director of ANC. The Court finds that no enforceable oral contract was ever formed by the parties because of their inability to reach a definite agreement or meeting of the minds on a number of issues. *Arnold Palmer Golf Co. v. Fuqua Industries, Inc.*, 541 F.2d 584, 587 n. 2 (6th Cir.1976); *General Motors Corp. v. Keener Motors, Inc.*, 194 F.2d 669, 675–76 (6th Cir.1952). They could not agree on the terms of a franchise agreement, although it went through numerous drafts. They could not agree on the type, number or price of the stocks, or on the manner in which to provide Leisure compensation for his costs attendant to the Nursing Staff litigation. Nor were they able to reach agreement on the allocation of voting power in the new company.

The Court finds that all of the alleged elements of the claimed oral agreement were not severable and distinct, but rather were interrelated and interdependent. 6 Williston, Contracts § 860 (3d ed. 1962). When the parties were unable to reach agreement on the issues mentioned above, the defendants obtained the discharge of the guarantees which J.P., J.U., and G. Patel had executed.

■ The Columbus plaintiffs have alleged (Count I, C 83–1060) that defendants fraudulently induced them to execute the April 12, 1983 franchise agreement (PX 16) with ANC by representing that the ANC agreement was substantially identical to the Columbus agreement with Nursing Staff (PX 15) and by representing that ANC would forgive franchise fees accrued prior to December 1, 1982, would refund all fees ever paid by Columbus to Nursing Staff, and would give N. Patel an option to acquire stock in ANC. The Court finds that no such representations were made.

Even if the Court were inclined to find that any representations were made regarding the terms of the ANC franchise agreement (PX 16) plaintiffs failed to prove intent to deceive on the part of defendants or justifiable reliance on the part of N. Patel and Columbus. 50 O.Jur.3d, *Fraud and Deceit* §§ 22, 127, § 140; 17 O.Jur.3d, *Contracts* § 18. The franchise agreement was in N. Patel's possession for two weeks prior to his executing it and was facially different from the Nursing Staff agreement. Moreover, the Court finds that if N. Patel and Columbus relied on any representations, they were primarily on the representations of J.P. Patel to N. Patel that he was also going to sign the agreement.

The Columbus plaintiffs allege (Count II, ¶ 26, C 83–1060) that defendants entered into an oral contract whereby, if N. Patel and Columbus would execute the ANC franchise agreement, ANC would forgive fees accrued prior to December 1, 1982, would refund all fees ever paid by Columbus to Nursing Staff and would give N. Patel an option to acquire stock in ANC. The Court finds that no such contract was made.

The Court does not find credible the testimony of N. Patel that he and Leisure reached a detailed oral agreement while the two were in a swimming pool, during a seminar in French Lick, Indiana in January, 1983.

All of the plaintiffs have alleged that their respective franchise agreements were breached because they were not provided guidance and assistance (Count II, C 83–972; Count II, ¶s 24–25, C 83–1060; Count I, C 83–1135). These allegations in the Toledo and Dayton cases relate to the period of time prior to ANC's acquisition of the contract rights, when NSI was the franchisor. The Court finds that all plaintiffs were provided with assistance by other franchisees within the system while they were NSI franchisees and from ANC after it acquired the contract rights. Even if there had been a technical breach, the Court finds that Toledo and Dayton waived such breach by continuing as franchisees and getting others involved in the business.

■■■ All of the plaintiffs allege that they were offered or sold unregistered securities in violation of Section 5 of the Securities Act 1933 (15 U.S.C. § 77e) (Count III, all cases) and the Ohio Blue Sky Law (O.R.C. § 1707.01 et seq.) (Count VIII, C 83–972; Count VII, C 83–1060; C 83–1135). The Court finds that no offer or contract of sale was made with respect to the ANC stock. The weight of the evidence establishes that no stock was offered or discussed with N. Patel by defendants. All discussions with J.P. Patel, J.U. Patel and G. Patel, were preliminary and part of a larger plan to create a new franchising company to be jointly owned and operated by all. There was no agreement on the essential terms for the sale of stock. Some plaintiffs allege that the shares were to be issued solely in exchange for a guarantee of a corporate loan and use of the new name, but all admit that they would have to pay cash for the issuance of the stock. There was also no agreement on the terms of the franchise agreement, the execution of which the Court finds to have been a condition precedent to the sale of the stock.

There was also no agreement on the Code of Regulations for ANC. Since there was no offer of stock or binding contract to subscribe for, or purchase the stock, there can be no liability under Section 12(1) of the 1933 Act (15 U.S.C. § 77l). The Court finds that the discussions among the parties regarding the new company and its stock cannot be deemed an "offer" or "sale" as defined by the 1933 Act (15 U.S.C. § 77b(3)). Also, because there was no enforceable contract right to acquire stock, the plaintiffs do not qualify as "purchasers" and therefore lack standing to sue under Section 12(1). *Thomas v. Roblin Industries*, 520 F.2d 1393, 1396 (3d Cir. 1975); *Greater Iowa Corp. v. McLendon*, 378 F.2d 783, 789 (8th Cir.1967).

■■■ The Court finds that there was no violation of the Ohio Blue Sky Law, O.R.C. § 1707.01 et seq. The discussions regarding ANC stock do not fit within the statute's broad definition of "sale" (O.R.C. § 1707.01(C)(1)). Also, the statute's exemptions demonstrate that no registration of preliminary transactions is required. See O.R.C. § 1707.03(G)(1) and (K)(3).

■■■ The plaintiffs allege that the offering or sale of ANC securities to them was fraudulent because ANC had no intent to issue the stock. Plaintiffs assert claims under §§ 12(2) and 17 of the Securities Act of 1933, 15 U.S.C. §§ 77l(2) and 77q and § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated thereunder (Counts IV and V, all complaints). The Court finds that since no definitive promises or agreements were made to issue the stock, there is no fraud claim.

As discussed above, the plaintiffs were not purchasers of securities. Accordingly, they have no standing to assert antifraud claims under any of these sections. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750–55, 95 S.Ct. 1917, 1932–34, 44 L.Ed.2d 539 (1975); *Southeastern Waste Treatment, Inc. v. Chem-Nuclear Systems, Inc.*, 506 F.Supp. 944 (N.D.Ga.1980); *Wolfson v. Litton Industries, Inc.*, 336 F.Supp. 1039 (S.D.N.Y.1971).

Plaintiffs allege that the previously discussed alleged securities frauds and the fraud in the formation of the Toledo contract constitute sufficient predicate acts for the application of RICO, the Racketeer-Influenced Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* (Count VI, all complaints). The other alleged predicate act is a threat of litigation by ANC if the franchise agreements were not honored. Such a threat does not constitute a criminal act and is not a predicate act for RICO purposes. 18 U.S.C. § 1951; *United States v. Enmons,* 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973); *State v. Barger,* 111 Ohio St. 448, 145 N.E. 857 (1924). The Court found no credible evidence that any plaintiff was the victim of threats by defendants other than the threat of litigation. Any use of the mails was in the ordinary course of business and not, in any event, fraudulent. *See Barker v. Underwriters at Lloyd's London,* 564 F.Supp. 352 (E.D.Mich.1983).

The RICO claims also fail because the plaintiffs failed to prove the requisite elements of 18 U.S.C. § 1962(a) or (b), that defendants had received any income from the alleged pattern of racketeering activity which they used in an enterprise in interstate commerce or that they acquired an interest in an enterprise in interstate commerce through the alleged pattern of racketeering activity.

The RICO claims also fail because the plaintiffs have not alleged or proved a criminal enterprise separate and distinct from the alleged pattern of racketeering activity. This is a distinct and necessary element of a RICO claim. *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1980); *United States v. Sutton,* 605 F.2d 260 (6th Cir.1979).

The plaintiffs have also failed to demonstrate any injury other than that alleged to have resulted from the predicate acts. The plaintiffs' alleged RICO damages only repeat the prior allegations of the predicate acts. Since no distinct injury has been pled or proven, the RICO claims must be dismissed. *Sedima S.P.R.L. v. Imrex Co.,* 741 F.2d 482 (2d Cir.1984); *Moss v. Morgan Stanley, Inc.,* 553 F.Supp. 1347 (S.D.N.Y.), *aff'd,* 719 F.2d 5 (2d Cir. 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984); *Landmark Savings & Loan v. Rhodes,* 527 F.Supp. 206 (E.D.Mich.1981).

Toledo seeks to rescind its original contract on the grounds that at the time of its formation, the franchisor (N.S.I.) did not comply with the provision of the Ohio Business Opportunity Purchaser's Act, which essentially requires a disclosure statement prior to execution of a Business Opportunity Plan as defined in the Act (Count VII, C 83–972). The plaintiffs do not allege, nor have they proven, exactly how they were injured or damaged by these departures from the Act.

The Court finds that the Act did not apply to this contract. The Act defines a Business Opportunity Plan as an agreement whereby the purchaser provides the right to sell goods or services which are supplied by the seller or some third party selected by him. O.R.C. § 1334.01(D)(1). Toledo was in the business of providing nursing services and these services were not supplied to it by NSI or ANC. Rather it hired the nurses itself. Accordingly, the Act does not apply.

In addition, the agreement was continually renewed and extended by Toledo during the two and one-half years while it was in effect. The original agreement was for one year and thereafter could be terminated at will by Toledo upon thirty days notice. Accordingly, the agreement became exempt from the Act by virtue of O.R.C. § 1334.12(N) which exempts any renewal or extension of an existing plan if the original agreement was for one year. In addition, because a complete disclosure statement was given to Toledo in the Spring of 1983 in connection with the attempt to execute a new contract and it thereafter elected to continue under the agreement, the exemption provided for in O.R.C. § 1334.13 also applies. That section exempts agreements executed ten days af-

ter receipt of a disclosure statement. Even though the agreement was not formally reexecuted (although ANC attempted to do this), Toledo's election to continue under the previous agreement is sufficient to invoke this exemption.

■ Because the Court has found Count I of the complaints in Nos. C 83–972 and C 83–1060 to be without merit, ANC, Inc.'s third party complaints in those actions are moot and will be dismissed.

Since there was no oral contract supplanting the written contractual agreements among the parties, the controlling document in the relationship between ANC and Toledo is the NSI License Agreement of June 2, 1981 (PX 1); that between ANC and Dayton is the NS License Agreement of October 26, 1978 (DX 56). The controlling document between ANC and Columbus is the Franchise Agreement signed on April 12, 1983 (PX 16).

■ In renouncing their franchise agreements by changing the names of their businesses and filing suit against ANC and Leisure, plaintiffs materially breached their contractual obligations. In considering the counterclaims of defendants in each of the three actions, the Court must determine the extent to which the provisions of the contracts in question are enforceable. The three licensing agreements are not identical. However, they contain a number of similar or identical provisions.

Franchise relationships present inherent dangers which are common in adhesion contracts and in business contracts between parties in unequal bargaining positions. The Court will exercise great caution in construing and applying the provisions of the license agreements in question. H. Brown, *Franchising: Realities and Remedies*, §§ 2.01, 2.03 (Law Journals Seminars-Press, Inc. 1981). All of the contracts under consideration are, as is typical in such agreements, highly favorable to the franchisor while offering the franchisees little protection. This is particularly true of the Columbus franchise agreement.

■ Defendants are entitled to the following injunctive relief: That plaintiffs, their officers, directors, agents, servants, employees, and attorneys, and all those persons in active concert or participation with them be permanently enjoined and restrained:

1. From using the name American Nursing Care, Nursing Staff, American Nursing Care of Toledo, Inc., or Nursing Staff of Toledo, Inc., Nursing Staff of Columbus, Inc., American Nursing Care of Columbus, Inc., Nursing Staff of Dayton, Inc., American Nursing Care of Dayton, Inc., or the words American, Nursing, Care, or Staff, or any other name confusingly similar to that of defendant or its assignor.

2. From using the forms, training materials or advertising materials of defendant or its assignor, or any other materials using, referring to, or containing the name American Nursing Care, Inc., or the names American Nursing Care of Toledo, Inc., Nursing Staff of Toledo, Inc., American Nursing Care of Columbus, Inc., Nursing Staff of Columbus, Inc., American Nursing Care of Dayton, Inc., Nursing Staff of Dayton, Inc., or Nursing Staff, Inc., or the logos, trademarks, trade names or service marks of defendant, or its assignor.

3. From using any advertising utilizing defendant or its assignor's name, logo, trademarks, trade names, or service marks, or the names American Nursing Care of Toledo, Nursing Staff of Toledo, American Nursing Care of Columbus, Nursing Staff of Columbus, American Nursing Care of Dayton, or Nursing Staff of Dayton; and enjoining plaintiffs from further advertisement of such names or similar names and requiring all such advertising materials to be transferred to the defendant and counterclaim plaintiff forthwith; and enjoining plaintiffs from advertising their former association with defendant.

4. From contacting any licensee of defendant or any officer, director, agent, servant or employee of such licensee in an attempt to cause or encourage such licensee to breach its license agreement with

defendant or to cause or encourage such licensee to cease paying its royalty fee under such agreement or to impart any false adverse information regarding defendant and counterclaim plaintiff to such licensee.

Defendants are also entitled to an order requiring plaintiffs to return to defendants all forms, training and advertising materials, or any other materials using, referring to, or containing the name American Nursing Care, Inc., or the names American Nursing Care of Toledo, Inc., Nursing Staff of Toledo, Inc., American Nursing Care of Columbus, Inc., Nursing Staff of Columbus, Inc., American Nursing Care of Dayton, Inc., Nursing Staff of Dayton, Inc., or Nursing Staff, Inc., or the logos, trademarks, trade names or service marks of defendant, or its assignor.

An appropriate injunction will be issued. Defendants are entitled to no other injunctive relief. The Court denies enforcement of a number of terms of the licensing agreements for the reasons discussed below.

■ Defendant's business forms are, as a matter of law, not entitled to copyright protection. 37 C.F.R. § 202. They are merely common business forms for recording generic business information indigenous to the kind of business in which ANC and many other companies are engaged. Their being disclosed to ANC's franchisees prior to the signing of any franchise contract or nondisclosure agreements, and their unpoliced use in the normal course of business caused them to be in the public domain and unprotectible as trade secrets. *McAlpine v. Aamco Automatic Transmissions, Inc.*, 461 F.Supp. 1232, 1255–1259 (E.D.Mich.1978). Defendants did not show that their business methods and procedures are protectible. The Court finds that while many of the methods used by defendants and shared with the franchisees were clever and good business practice, they can best be characterized as common sense business strategies, not "trade secrets," as defined by O.R.C. § 1333.51(A)(3).

■ Plaintiffs are not guilty of unfair competition or infringement. The only place where plaintiffs' names continue to be listed as affiliated with defendant ANC is in telephone books, which cannot change or be changed until the next edition, the first of which, that in Columbus, recently came out. These changes were promptly arranged by plaintiffs. *Kampgrounds of American, Inc. v. North Delaware A-Okay Kampground, Inc.*, 415 F.Supp. 1288, 1296–97 (D.Delaware 1976), Affd. Mem. 556 F.2d 566 (3rd Cir.1977). The plaintiffs have done everything they could to avoid promoting a false perception that they remained affiliated with defendant ANC.

■ Defendants are not entitled to enforcement of the licensing agreement provisions that plaintiffs turn over to ANC their telephone numbers, employee and customer records. The Court finds that all plaintiffs gave up substantial goodwill when they changed their names from Nursing Staff to American Nursing Care as part of the unsuccessful attempts to form a new business with Leisure. It would be unconscionable to, at this time, require plaintiffs to give up whatever goodwill they have succeeded in building up through use of these numbers.

■ The Court finds that to require plaintiffs to turn over their employee and customer lists to defendants would work a forfeiture of their businesses. These lists are not trade secrets. Plaintiffs, not defendants, developed them.

■ The Court finds the terms of the covenants not to compete in all agreements to be unenforceable. Defendants have not shown the reasonableness as to time or area of these covenants. The Toledo and Dayton contracts (PX 1, § 4(j); DX 56, § XI) provide that the franchisees will not, for one year after termination of the agreement, be directly or indirectly associated with any business competitive with the franchisor, within the licensed area or within ten miles of any of franchisor's of-

fices. The Columbus contract (PX 16, § VIII, D) provides that franchisee will not compete for 24 months after termination or within 100 miles of a franchisor's office. The Court finds that enforcement of these covenants would impose undue hardship upon the plaintiffs and would be injurious to the public interest. See *Extine v. Williamson Midwest, Inc.*, 176 Ohio St. 403, 200 N.E.2d 297 (1964); *Premix, Inc. v. Zappitelli*, 561 F.Supp. 269, 275–76 (N.D. Ohio 1983); *see also Williams v. Hobbs*, 9 Ohio App.3d 331, 460 N.E.2d 287 (Ct.App. Franklin Cty., 1983). Enforcement would amount to a forfeiture of plaintiffs' capital assets and unduly interfere with plaintiffs' right to make a living. Further, because defendants have not established unique qualities in their business format, enforcement is not proper. See *Brown, supra* at §§ 3.02[1] and 9.07. Also, the Court takes into consideration the fact that defendant's competing temporary nursing care offices were not existing enterprises in Toledo, Dayton, and Columbus until after plaintiffs had breached the agreement. See *Interstate Automatic Transmission Co. v. W.H. McAlpine Co.*, [CCH Business Franchise Guide] paragraph 7674 (N.D.Ohio 1981); *Brown, supra* at § 9.07.

■ The Court finds the liquidated damages clauses of the franchise agreements unconscionable and will not enforce them.

■ Defendants are not entitled to attorney's fees. It is well settled that in Ohio any stipulation to pay attorney's fees as part of the costs of an action or an obligation is contrary to public policy. *Miller v. Kyle*, 85 Ohio St. 186, 97 N.E. 372 (1911).

■ The Court finds that ANC is entitled to an accounting and damages representing the accrued but unpaid franchise fees. Defendants are entitled to the franchise fees provided for under the licensing agreements, including those due but not paid to Nursing Staff until the date upon which ANC opened offices in each of the respective cities. In calculating the amounts due, plaintiffs J.P., J.U. and G. Patel will not subtract the percentages which the contracts provide as payable to them.

■ ANC is also entitled to damages for breach of each of the franchise agreements. The Court finds that Leisure purchased the Patels' contracts from NSI in reliance upon representations by J.U., J.P. and G. Patel that they would honor these agreement. Although the Court has found certain provisions of the contracts to be unenforceable, nevertheless there was sufficient consideration to support the contracts. The plaintiffs having breached the contracts, they should now respond in damages.

■ The Court finds no basis which would justify the imposition of punitive damages.

THEREFORE, for the foregoing reasons, good cause appearing, it is

ORDERED that judgment be entered against plaintiffs in Case Nos. C 83–972, C 83–1060 and C 83–1135; and it is

FURTHER ORDERED that plaintiffs' complaints be, and they thereby are dismissed; and it is

FURTHER ORDERED that judgment be entered in favor of defendants on their counterclaims in Case Nos. C 83–972, C 83–1060 and C 83–1135 as specified herein; and it is

FURTHER ORDERED that the third-party complaints in Case Nos. C 83–972 and C 83–1060 be, and the same hereby are, dismissed; and it is

FURTHER ORDERED that this Court's order of December 14, 1983 in Case No. C 83–1060, regarding the method by which A–1 Nursing Care is to answer telephone calls, be, and the same hereby is, VACATED; and it is

FURTHER ORDERED that plaintiffs disclose and produce all records necessary for the calculation by defendants of back franchise fees which are owing to them as specified herein; and it is

FURTHER ORDERED that defendants file a brief on the issue of their damages as delineated herein by January 7, 1985; plaintiffs are to respond by January 21, 1985; and it is

FURTHER ORDERED that a hearing on the issue of damages be, and hereby is, scheduled for February 1, 1985 and 9:00 A.M.