John R. MOSES a/k/a Bob Moses, Appellant,

Kent William Marsh, Plaintiff,

v.

Robin CARNAHAN, Secretary of State and David Cosgrove, Commissioner of Securities, Respondents.

No. WD 65172.

Missouri Court of Appeals, Western District.

March 28, 2006.

Joseph R. Soraghan, St. Louis, MO, for appellant.

Trevor Bossert, Assistant Attorney General, Jefferson City, MO, for respondents.

Before HAROLD L. LOWENSTEIN, Presiding Judge, JOSEPH M. ELLIS, Judge and THOMAS H. NEWTON, Judge.

JOSEPH M. ELLIS, Judge.

John Robert Moses (a/k/a Bob Moses) and Kent William Marsh (collectively referred to as "Appellants") appeal a "Final Order and Judgment" of the Circuit Court of Cole County upholding an August 10, 2004 "Final Order" issued by the Missouri Commissioner of Securities ("Commissioner") finding that, on February 5, 2003,

Appellants illegally offered unregistered securities for sale in violation of section 409.301 of the Missouri Uniform Securities Act ("Act"), §§ 409.101–409.418.[1] The circuit court also upheld a related portion of the Commissioner's Final Order placing certain temporary restrictions on any future efforts by Appellants to raise capital in Missouri. We affirm.

## Facts and Procedural History

As found by the Commissioner, the facts of this case are undisputed. Indeed, in their opening brief, Appellants state that "[f]or the purpose of this appeal, Appellants accept the Commissioner's findings of fact . . . as correct." Those undisputed facts are as follows. Moses organized a Missouri corporation called Rock Island Tie & Timber, Inc. ("Rock Island"), which had invented and was selling a wood treatment product called Herculean. Moses served as President and Chief Executive Officer of Rock Island from November 2002 through at least March 2003.

Marsh was a field pesticide applicator and tester for Rock Island. However, he was not compensated by Rock Island for this work. Sometime in early 2003, Marsh spoke to an acquaintance named Jason Bax about the Herculean product. Bax worked in the deck restoration field, doing business under the name Deckare. As a licensed commercial pesticide applicator, Marsh was previously acquainted with Bax and had known him for at least seven years. During their conversations, Marsh asked Bax whether some of Bax's wealthier customers would be interested in investing in Rock Island. These individuals did not express any interest, so Bax asked Marsh if it was permissible to contact people whom he believed had smaller amounts of money available to invest, and Marsh approved this approach.

## The Riley Chevrolet Meeting

Bax invited Mark Williams, an employee at Riley Chevrolet in Jefferson City, Missouri, to a dinner meeting with Marsh and Bax at Domenico's, a restaurant also in Jefferson City. Bax introduced Marsh and Williams, and advised Williams that Rock Island was looking for investors. Rock Island and its product were discussed at the dinner meeting, as was the possibility of investing in the company. Marsh asked Williams if he wanted to get a group of people together who would be interested in investing, because Rock Island representatives would be happy to attend and make a presentation. Williams agreed, and scheduled a meeting at Riley Chevrolet, inviting various co-workers from the car dealership. Bax also invited James Chouinard, an individual who worked with Bax in the deck restoration business.

On the afternoon of February 5, 2003, Marsh went to Rock Island's office to discuss the upcoming meeting at Riley Chevrolet, which was scheduled to be held that evening. Joseph Kaiser, a strategic consultant to Rock Island with experience as a registered securities agent, advised Marsh that he could not and would not go to the meeting as a representative of Rock Island. Marsh then advised Moses that he needed somebody affiliated with Rock Island to attend the meeting, after which Moses told Marsh that someone would be available to attend the meeting. That "someone" turned out to be Moses himself.

The meeting, which took place in Riley Chevrolet's showroom after the business had closed for the day, was held as scheduled. The attendees believed that the purpose of the meeting was to learn about Rock Island to assist them in deciding whether to invest money. Either Bax or

1. Unless otherwise specified, all statutory references are to RSMo 2000.

Williams told the individuals who had been invited that investing was the reason for the meeting, and that Marsh had approved the type of people being contacted and this communication.

In addition to Moses, Marsh, Bax, and Williams, approximately six or seven persons attended the meeting at Riley Chevrolet, nearly all of whom were unacquainted with Moses or Marsh. Marsh began the presentation by describing the Herculean product and the various field tests he had conducted demonstrating its effectiveness. Moses then took over, and after talking about Rock Island's products and corporate history, began making a presentation about investing in Rock Island. During this presentation, Moses told the attendees that Rock Island was building or expanding its facility for the manufacture of its products and was considering seeking financing in the form of convertible promissory notes, or "warrants." He said the notes would be sold, and that he wanted to take the company public for what he hoped would be a price of $20 per share. Moses made projections of what the warrants would be worth in the future, and discussed an investor's right to exercise the warrants at any time. He also distributed and caused others to distribute a draft of the proposed Convertible Promissory Note ("Note") itself, as well as copies of Rock Island's business plan, to the attendees. Marsh also willfully participated in this distribution and reasonably anticipated that it would occur when he encouraged Bax and Williams to invite interested individuals to the meeting.

The Note which was distributed to the attendees included the following provisions:

1. The term of the investment was for a period not to exceed two years.
2. The investor would receive a Class A Warrant equal to 1.2 shares of common stock of Rock Island for each $5 invested.
3. Repayment would be monthly, based on monthly paid production of Rock Island's product.
4. A portion of the paid production would be placed in an escrow account by Rock Island for distribution to investors.
5. Investors would be able to choose between the options of a) having the note repaid and receiving 1.2 shares of Rock Island common stock for each $5 invested, or b) converting the note to "paid in capital" and receiving 2.2 shares of Rock Island common stock.

Moses told the attendees that there was risk to the investment, and that he was required by law to inform them that any money invested in Rock Island could be lost. He also told them that individuals who wanted to invest would need to come to Rock Island's offices by no later than the coming Memorial Day (May 26, 2003). No securities were actually purchased as a result of the Riley Chevrolet meeting, either during the meeting or afterwards.

### The Spectators Meeting

Bax subsequently arranged another meeting at Spectators Sports Billiards, a sports bar in Jefferson City. Bax invited people to the meeting by telephoning certain individuals, who in turn invited others. Chouinard, who had also been invited to the presentation at Riley Chevrolet, invited his partner, Paul Clark, of Columbia, Missouri. On February 12, 2003, a meeting was held in a small back office at Spectators belonging to Scott Drinkard, who was a part owner of Spectators and one of the people attending the meeting. The sports bar was open and music was playing.

Moses did not attend the Spectators meeting. Rather, Marsh was joined by the Vice President of Rock Island, Edward Martin McLaughlin. In addition to Marsh, McLaughlin, and Bax, there were eight people in attendance, nearly all of whom did not previously know either Moses or Marsh.

The meeting was not as organized as the presentation at Riley Chevrolet, and people were coming and going throughout the presentation. Marsh discussed Rock Island's Herculean product and distributed or caused to be distributed Rock Island's business plan. McLaughlin told the attendees that he was not there to discuss anything about stocks or securities. He said that if anybody wanted to learn more about investing, they needed to set up a one-on-one meeting with Rock Island. No promissory note was distributed at the Spectators meeting. As with the Riley Chevrolet meeting, no securities were actually purchased as a result of the meeting at Spectators.

The Missouri Securities Commission ("Commission") received an anonymous complaint about the meeting which was scheduled to take place at Riley Chevrolet on February 5, 2003. Thereafter, the Commission commenced an inquiry into the matter, during which it was determined that Appellants conducted the meeting on the evening of February 5, 2003, and had discussed investments involving certain unregistered securities. This led the Commission to issue a "target letter" to Moses on February 21, 2003, the filing (by counsel for the Enforcement Section of the Securities Division) of a Petition for Order to Cease and Desist on September 18, 2003, and the Commissioner's Order to Show Cause on September 19, 2003. After briefing and further discussion between Appellants and the Commission, the Commissioner issued his "Order Fixing a Condition on Sale" on December 3, 2003, which placed certain requirements on future endeavors by Appellants to raise capital in Missouri.

Appellants then requested a contested evidentiary hearing before the Commissioner, which was held on March 24 and May 28, 2004. Following the hearing, and after post-hearing briefs were filed and considered, the Commissioner issued his Findings of Fact, Conclusions of Law and Final Order ("Final Order") on August 10, 2004. In his detailed 23-page Final Order, the Commissioner found that while there had been no violation during the meeting at Spectators on February 12, 2003, Appellants unlawfully offered unregistered securities for sale during the meeting at Riley Chevrolet on the evening of February 5, 2003, in violation of section 409.301 of the Act. Finding that such a "notice-filing requirement on future solicitations is just and necessary and will adequately protect the investing public," the Commissioner also ordered Appellants to file with the Commissioner, "[n]o less than ten days prior to any solicitation by [them] of prospective investors in any offering made in reliance upon Missouri's limited offering exemption now found in § 409.2–202(14) of the Missouri Securities Act of 2003, a notice of their intent" to rely on the exemption, including "a copy of any materials being distributed to prospective investors," until January 1, 2008.

Appellants then sought and received judicial review of the Commissioner's Final Order in the Circuit Court of Cole County, which issued a Final Order and Judgment affirming the Commissioner's Order in its entirety on January 26, 2005. This timely-filed appeal followed.

## Appellate Jurisdiction

At the outset, we must determine whether we have appellate jurisdiction to

entertain this appeal. Although neither Appellants nor Respondents have questioned it,. either in their briefs or during oral argument, it is the initial duty of this court to inquire into and determine its jurisdiction *sua sponte*. *Chromalloy Am. Corp. v. Elyria Foundry Co.*, 955 S.W.2d 1, 3 (Mo. banc 1997). If it appears that we do not have jurisdiction, but that the Supreme Court of Missouri does, our only authority in this matter is to transfer it to the Supreme Court. *See State v. Lomax*, 470 S.W.2d 161, 162 (Mo.App. S.D.1971); *Mo. Const. art. V, § 11; § 477.080.2.*

The conduct by Appellants which gave rise to the case *sub judice* occurred in February 2003. Meanwhile, the Missouri Securities Act of 2003, which repealed the Missouri Uniform Securities Act and replaced it with a revised regulatory scheme, took effect on September 1, 2003. *§§ 409.1–101 & 409.7–701*, RSMo Cum. Supp.2003. According to the transition provisions of the new Act, this case must be decided under the prior Missouri Uniform Securities Act as it existed at the time of the alleged violation in February 2003. *See § 409.7–703(a)*, RSMo Cum. Supp.2003, which states, in pertinent part, that "[t]he predecessor act exclusively governs all actions or proceedings that are pending on September 1, 2003, or may be instituted on the basis of conduct occurring before September 1, 2003[.]"

Section 409.412 (titled "Judicial review of orders"), which was part of the former Missouri Uniform Securities Act, *see § 409.416*, was signed into law by the governor in August 1967 and became effective on January 1, 1968. *1967 Mo. Laws 634, 637.* It provides, in relevant part (emphasis added):

(a) Except as otherwise provided in section 409.204,[2] any interested person

aggrieved by any order of the commissioner under any provision of this chapter, or by any refusal or failure of the commissioner to make an order under any of said provisions, shall be entitled to a hearing before the commissioner in accordance with the provisions of chapter 536, RSMo.

(b) The circuit court of Cole County shall have jurisdiction in equity to review, modify, amend or annul any ruling, finding or order of the commissioner. At any hearing in the course of such proceeding, a transcript of any testimony before the commissioner in such case, duly certified by the commissioner, shall be admitted as evidence.

(c) Any such final order or decree of the circuit court of Cole County may be reexamined and affirmed, reversed or modified *by the supreme court of the state of Missouri upon appeal by either party* to be taken in the same manner and under the same rules as exist or may be hereafter provided in cases of appeals from decrees rendered in circuit court.

*§ 409.412.* In the many years since section 409.412 was enacted, it appears that it has never previously been construed or even cited by any appellate court of this state.

■ Under the plain and unambiguous terms of section 409.412(c), exclusive appellate jurisdiction of this appeal would lie in the Supreme Court of Missouri. *See, e.g.*, 1A Stinson, Mag & Fizzell, "Missouri Blue Sky Law," Missouri Practice: Methods of Practice—Transaction Guide § 28.28 at 262 (4th ed.2001) (noting that under section 409.412(c), the final judgment issued by the Cole County Circuit Court after its review of the Commission-

---

**2.** Section 409.204, which, among other things, provides for summary action by the

Commissioner under certain circumstances, is not relevant here.

er's order under any provision of the Missouri Uniform Securities Act "is appealable directly to the Missouri Supreme Court by either party."). However, as noted *supra*, section 409.412(c) was enacted in 1967 and became effective January 1, 1968, prior to adoption of Missouri's current judicial article on August 3, 1976, which became effective on January 2, 1979. *Mo. Const. art. V, § 27.*

Article V, § 27, subsection 20 of the Missouri Constitution provides:

All laws and rules inconsistent with the provisions of this article shall, on the effective date hereof, be and are repealed. Except to the extent inconsistent with the provisions of this article, all provisions of law and rules of court in force on the effective date of this amendment shall continue in effect until superseded in a manner authorized by the constitution or by law.

This raises the question of whether section 409.412(c) was repealed by operation of law on January 2, 1979 by virtue of article V, section 27, subsection 20 or actually survived Missouri's adoption of the amended judicial article and continued in effect as part of the Missouri Uniform Securities Act. The answer depends on whether section 409.412(c) is "inconsistent with the provisions of" article V, section 3 of the Missouri Constitution, which establishes the Missouri Supreme Court as a court of limited appellate jurisdiction. Article V, section 3 states:

The supreme court shall have exclusive appellate jurisdiction in all cases involving the validity of a treaty or statute of the United States, or of a statute or provision of the constitution of this state, the construction of the revenue laws of this state, the title to any state office and in all cases where the punishment imposed is death. The court of appeals shall have general appellate jurisdiction in all cases except those within the exclusive jurisdiction of the supreme court.

The current version of article V, section 3 is substantially different than its predecessor, the version contained in Missouri's Constitution of 1945 prior to adoption of the 1976 amendment. The 1945 version of article V, section 3, which was in effect when section 409.412(c) was enacted, stated (emphasis added):

The supreme court shall have exclusive appellate jurisdiction in all cases involving the construction of the Constitution of the United States or of this state, the validity of a treaty or statute of the United States, or any authority exercised under the laws of the United States, the construction of the revenue laws of this state, the title to any office under this state, the title to real estate, in all civil cases where the state or any county or other political subdivision of the state or any state officer as such is a party, in all cases of felony, *in other classes of cases as provided by law,* and until otherwise provided by law, in all cases where the amount in dispute, exclusive of costs, exceeds the sum of seventy-five hundred dollars.

Thus, under the 1945 version of article V, section 3, it seems clear that the legislature could vest in the Supreme Court exclusive appellate jurisdiction of particular types or classes of cases not specifically listed in article V, section 3. But there is no comparable language in the current version of article V, section 3, and, therefore, the issue is whether section 409.412(c) was repealed by adoption of the judicial article of 1976.

We have been unable to find any Missouri Supreme Court authority squarely addressing and deciding this issue. But we find the Supreme Court's decision in *State v. Olvera*, 969 S.W.2d 715 (Mo. banc 1998), sufficiently similar and, therefore, of

such precedential value as to be dispositive of the issue. In *Olvera*, a petition in the nature of quo warranto was filed seeking the ouster of Patsy Olvera, the Lafayette County recorder of deeds. *Id.* at 715. The trial court entered summary judgment for the petitioners, finding that Olvera had forfeited her right to hold the office. *Id.* Olvera appealed to the Missouri Supreme Court, asserting that the Supreme Court had jurisdiction of the appeal because it involved a state office for purposes of article V, section 3 of the Missouri Constitution. *Id.*

In addressing the issue, the Court first noted that the constitution limits its " 'exclusive appellate jurisdiction' to the kinds of cases set out in article V, section 3; among the cases that fall within that jurisdiction are those involving 'the title to any state office.' " *Id.* It then traced the recent history of the constitutional provision relating to its jurisdiction over state office issues. First, the Court observed that the 1945 state constitution provided that it had jurisdiction "in all cases involving 'the title to any office under this state' and 'in all civil cases where . . . any state officer as such is a party.' " *Id.* It then pointed out that this provision was amended effective January 1, 1972, to provide that the Court's jurisdiction "included cases involving 'the title to any office under this state' but not cases where a state officer as such was a party." *Id.* And then, when the current judicial article was adopted in 1976 and became effective on January 2, 1979, the jurisdiction was limited to cases involving " 'the title to any state office.' " *Id.;* *Mo. Const. art. V, § 3.* Observing that whether an office is a "state office" is a much narrower inquiry than whether an office is "an office under this state," the Court concluded that this evolution of its jurisdiction over those types of cases reflected that the voters desired to further limit its jurisdiction to cases where the

official functions and duties of the office are co-extensive with the boundaries of the state. *Id.* at 716. Accordingly, it held that Olvera's office was not a state office and transferred the case to this court. *Id.*

While *Olvera* did not involve a statute purporting to vest exclusive appellate jurisdiction of a particular type of case in the Supreme Court, its rationale and holding make it abundantly clear that section 409.412(c) is inconsistent with the current version of article V, section 3 of the constitution and, therefore, was repealed effective January 2, 1979. First, the *Olvera* Court expressly noted that the constitution now limits the Supreme Court's " 'exclusive appellate jurisdiction' *to the kinds of cases set out in article V, section 3.*" *Id.* at 715 (emphasis added). Second, and just as important, the evolution of the Court's jurisdiction to hear cases where a statute on its face appears to vest the Supreme Court with exclusive appellate jurisdiction is strikingly similar to that relating to "state office" issues. The previous version of article V, section 3, as noted *supra,* provided that the Supreme Court had exclusive appellate jurisdiction "in other classes of cases as provided by law." The current version of article V, section 3, adopted in 1976 and which became effective January 2, 1979, has no similar provision. In other words, as was the case in *Olvera,* the current constitutional language evidences the voters' desire to limit the Court's exclusive appellate jurisdiction "to the kinds of cases set out in article V, section 3." *Olvera,* 969 S.W.2d at 715.

So it is that we have no hesitation in concluding that section 409.412(c) is inconsistent with article V, section 3 of the Missouri Constitution and, by virtue of article V, section 27, subsection 20, was repealed on January 2, 1979.

The record shows that, pursuant to section 409.412(a), the contested case before the Commissioner was conducted and decided "in accordance with the provisions of chapter 536, RSMo," the Missouri Administrative Procedure Act, and that the Commissioner's Final Order was reviewed by the Circuit Court of Cole County under section 409.412(b). Since section 536.140.6 provides that "[a]ppeals may be taken from the judgment of the [circuit] court as in other civil cases," this appeal from a final judgment of the Circuit Court of Cole County falls within the "general appellate jurisdiction" of the Court of Appeals, *Mo. Const. art. V, § 3*, and was properly filed in this, the Western District thereof. *§ 477.070*. Having determined the question of our own appellate jurisdiction, we now proceed to decide the merits of this appeal.

## Standard of Review

The general legal principles governing our review of the Commissioner's administrative determination were set forth in *Roorda v. City of Arnold*, 142 S.W.3d 786 (Mo.App. W.D.2004):

This court reviews the decision of the [administrative agency], not that of the circuit court. On appeal from an agency decision in a contested case, we consider only whether the agency's findings are supported by competent and substantial evidence on the record as a whole. We may not substitute our judgment on the evidence for that of the agency, and we must defer to the agency's determinations on the weight of the evidence and the credibility of witnesses. If the decision of the agency is supported by substantial and competent evidence on the whole record, it must be affirmed. On the other hand, we must reverse the agency's findings if it is determined the decision is not supported by competent and substantial evidence on the whole record, or if the decision constitutes an abuse of discretion, or is unauthorized by law, or is arbitrary and capricious.

*Id.* at 789 (quoting *Orion Sec., Inc. v. Bd. of Police Comm'rs*, 90 S.W.3d 157, 163 (Mo.App. W.D.2002)); *see also § 536.140.2*.

 Although we are not bound by the interpretation of the agency as to questions of law or the application of law to undisputed facts, *Collins v. Dep't of Soc. Servs.*, 141 S.W.3d 501, 504 (Mo.App.S.D. 2004), Missouri courts have traditionally attempted to construe the Act "consistent with the interpretation given ... by the Missouri Commissioner of Securities." *State v. Kramer*, 804 S.W.2d 845, 848–49 (Mo.App. E.D.1991). Accordingly, the Commissioner's interpretation should be sustained unless it is unreasonable or arbitrary. *Collins*, 141 S.W.3d at 505. Therefore, we review the Commissioner's construction of the statutes and rules at issue here to determine "whether the [Commissioner's] interpretation, whether by regulation or otherwise, is reasonable, in light of the language, policies, and legislative history" of the Act. *Kidd v. Pritzel*, 821 S.W.2d 566, 574 (Mo.App. W.D.1991).

## Legal Analysis

Section 409.301 states: "It is unlawful for any person to offer or sell any security in this state unless: (1) It is registered under this act; (2) The security or transaction is exempted under section 409.402; or (3) It is a federal covered security." The Commissioner found that Appellants did not "sell any security," whether registered or unregistered, as a result of either the February 5, 2003 meeting at Riley Chevrolet or the February 12, 2003 meeting at Spectators. The Commissioner also found that Appellants did not "offer ... any security," whether registered or unregistered, during the February 12, 2003 meeting at Spectators, noting that "neither

Marsh, nor McLaughlin promoted investing" in Rock Island at that meeting and that the Notes had not been distributed to the attendees. However, the Commissioner did determine that they unlawfully "offered" unregistered, non-exempt, non-federally covered securities for sale during the February 5, 2003 meeting at Riley Chevrolet.

■ This brings us to Appellants' first point relied on, in which they argue that this determination was erroneous because, under the controlling case law, they did not "offer" any securities (registered or unregistered, exempt or non-exempt) to any of the attendees of that meeting.

■ The Act provides that, as used in sections 409.101 to 409.419, " '[o]ffer' or 'offer to sell' includes every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value" unless "the context otherwise requires." *§§ 409.401 & 409.401(m)(2)*. As the legislature itself has defined those particular terms, this definition "should be followed in the interpretation of the statute to which it relates and is intended to apply and supersedes the commonly accepted dictionary or judicial definition and is binding on the courts." *In re Estate of Hough*, 457 S.W.2d 687, 691 (Mo.1970).

There is no dispute that the Notes distributed by Appellants to the attendees of the meeting at Riley Chevrolet are "securities" under the Act. Not only does the Act include "any note" within the statutory definition of a "[s]ecurity," but the Note Appellants distributed to the attendees of the meeting at Riley Chevrolet also included options for the issuance of stock warrants. *See § 409.401(o)*. Nor is there any dispute that the Notes were not "registered" for offer or sale in Missouri and were not "federal covered securities" under the Act. Accordingly, Appellants' first

point relied on must be denied if, deferring to the Commissioner's determinations as to the weight and probative value of the evidence and the credibility of the witnesses who testified before him, there is competent and substantial evidence on the record as a whole that Appellants "offered" the Notes for value during the February 5, 2003 meeting within the meaning of the Act as that term is defined in section 409.401(m)(2).

As noted *supra*, unless the context requires otherwise, the terms "offer" and "offer to sell" include "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value." *§ 409.401(m)(2)*. Moreover, "[e]very sale or offer of a warrant or right to purchase or subscribe to another security of the same or another issuer, as well as every sale or offer of a security which gives the holder a present or future right or privilege to convert into another security of the same or another issuer, is considered to include an offer of the other security." *§ 409.401(m)(5)*.

Applying these statutory definitions, the record contains ample competent and substantial evidence to support the Commissioner's conclusion that Appellants "offered" the convertible Notes, not to mention the yet-to-be-issued shares of Rock Island common stock, for value to the attendees of the meeting at Riley Chevrolet.

As set forth in detail *supra*, Marsh approved Bax's request to contact potential investors whom Bax believed had money available to invest. The attendees of the Riley Chevrolet meeting believed (and were told by either Bax or Williams) that investing in Rock Island was the reason for the gathering, and that Marsh had approved the type of potential investors who were invited. After Marsh began the

presentation by describing the Herculean product and the various field tests he had conducted, Moses took over and began making a presentation designed to generate investment interest in Rock Island, thereby shifting the primary focus of the discussion from Rock Island's products to generating investment interest in Rock Island in the minds of those in attendance. During this presentation, Moses told the attendees that Rock Island was building or expanding its facility for the manufacture of its products and was considering seeking financing in the form of convertible promissory Notes. He said the Notes would be sold, and that he planned to take the company public for what he hoped would be a price of $20 per share. Moses made projections of what the Notes (which could later be converted into Rock Island common stock once the company "went public") would be worth in the future, and also discussed an investor's right to convert the Notes at any time. He also distributed and caused others (including Marsh) to distribute a draft of the Notes Rock Island intended to sell, as well as copies of Rock Island's business plan, to the attendees. Moses then told the attendees that there was risk to the investment, and that he was required by law to inform them that any money invested in Rock Island could be lost, which would have been entirely unnecessary had an "offer" not been made. He concluded his presentation by telling them that anyone who wanted to invest would need to come to Rock Island's offices by no later than the coming Memorial Day, which was then less than four months away.

On the basis of this evidence, the Commissioner could reasonably have concluded that Appellants violated section 409.301 during the course of the February 5, 2003 meeting at Riley Chevrolet since they clearly solicited offers to buy the convertible Notes and forthcoming Rock Island common stock for value. As the Commissioner put it:

> The cumulative effect of [Appellants'] conduct rises above mere networking. Instead, their actions amount to an overt invitation to the attendees to contact the company in order to purchase the securities. This is a solicitation of an offer to buy.

*Accord Feitler v. Midas Assoc.,* 418 F.Supp. 735, 736–38 (E.D.Wis.1976); *SEC v. Commercial Inv. & Dev. Corp. of Fla.,* 373 F.Supp. 1153, 1164 (S.D.Fla.1974); *Scheve v. Clark,* 596 F.Supp. 592, 595 (E.D.Mo.1984).

In their brief, Appellants urge us to hold that only an "offer" in the traditional contractual sense can suffice to establish an "offer" in the securities context, noting that it was impossible for them to have made a valid, binding contractual offer under the circumstances presented here. In support of this theory, they cite *American Nursing Care of Toledo, Inc. v. Leisure,* 609 F.Supp. 419 (N.D.Ohio 1984). *Leisure* does indeed appear to express the view that the offeror's statements must rise to the level of a valid contractual offer to be actionable under the federal Securities Act of 1933. *Id.* at 429. However, *Leisure* has apparently never been cited for that proposition since it was decided over two decades ago. Indeed, most federal courts have explicitly recognized that the expansive definition of "offer" contained in the Securities Act of 1933, 15 U.S.C. § 77a *et seq.,*[3] goes "well beyond the common law concept of an offer," and that even if the offer, "once accepted, did not give rise to an enforceable contract, that fact is immaterial" in determining whether an offer to

---

**3.** We note that Section 2(3) of the Securities Act of 1933 (15 U.S.C. § 77b(a)(3)) defines "offer" and "offer to sell" in exactly the same terms as the Missouri Uniform Securities Act.

sell securities occurred. *SEC v. Cavanagh,* 1 F.Supp.2d 337, 368 (S.D.N.Y. 1998). *See also SEC v. Cavanagh,* 155 F.3d 129, 135 (2d Cir.1998) (observing that the extremely broad definition of "offer" contained in the Securities Act confirms that the "definition extends beyond the common law contract concept of an offer" and is meant to cover conduct that normally one would not consider an "offer" in the traditional sense); *Hocking v. Dubois,* 885 F.2d 1449, 1457–58 (9th Cir.1989) (noting that "the term 'offer' has a different and far broader meaning in securities law than in contract law"); *SEC v. Thomas D. Kienlen Corp.,* 755 F.Supp. 936, 940 (D.Or. 1991) ("Impossibility of performance is not dispositive to the court's determination of whether defendants' conduct constituted an 'offer to sell.' ")

■ Moreover, the Commissioner's interpretation and application of the intended meaning of "offer" is much more consistent with the purposes of the Missouri Uniform Securities Act than that proposed by Appellants, because "[f]ulfillment of [the Act's] statutory purpose 'embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.' " *State v. Reber,* 977 S.W.2d 934, 938 (Mo.App. S.D.1998) (quoting *Garbo v. Hilleary Franchise Sys., Inc.,* 479 S.W.2d 491, 499 (Mo.App. E.D.1972)) (internal quotation marks and ellipses omitted). "The courts in Missouri have long recognized the need to look to substance rather than form and to examine all the circumstances surrounding the transaction in order to effectuate the purposes of securities laws." *Kramer,* 804 S.W.2d at 847. "This flexible approach ... is predicated upon a recognition of the fact that the ingenuity of those who resort to 'get rich schemes' to fleece

the gullible public is boundless. No hard and fast rule or rigid definition ... which is impervious to evasion can be devised." *Id.* at 848; *see also SEC v. Addison,* 194 F.Supp. 709, 722 (N.D.Tex.1961) (noting that under the Securities Act of 1933, the terms "offer" and "offer to sell" are "broadly defined to include ingenious methods employed to obtain money from members of the public to finance ventures.")

The adoption of the rigid definitional rule proposed by Appellants would make it much more difficult for the Commissioner to balance the all-too-often competing interests of legitimate start-up companies in need of seed capital with the need to protect Missouri consumers from "the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Garbo,* 479 S.W.2d at 499 (internal quotation marks omitted). That the Commissioner attempted to fairly balance those competing interests is readily apparent in this case because the Commissioner found that while Appellants' words and conduct at the Riley Chevrolet meeting—including discussing the price and value of the Notes, as well as actually distributing copies of the Notes themselves (something Appellants' own expert witness, Kenneth Harrington, referred to as "a mistake ... under current law") and cautioning the attendees as to the risks of investing in Rock Island—rose to the level of an "offer" under the Act, their activities at the Spectators meeting did not.

■ Of course, "the line drawn between an announcement containing sufficient information to constitute an offer and one which does not must be to some extent arbitrary." *Chris–Craft Indus., Inc. v. Bangor Punta Corp.,* 426 F.2d 569, 574 (2d Cir.1970). While the circumstances attending the meetings under consideration

here clearly required the Commissioner to perform such line-drawing, "we think this is an appropriate instance in which to defer to the interpretation rendered by the agency [the legislature has] entrusted with administration of the statute."[4] *Wimberly v. Labor & Indus. Rel. Comm'n*, 688 S.W.2d 344, 349 (Mo. banc 1985).

While they do not deny that the Commissioner's interpretation of the term "offer" promotes the public policy expressed by the Act and is also entirely consistent with the definitions found in the Act, Appellants do argue that when no actual sale results, consumers *simply do not need to be protected* from something as innocuous and inchoate as the mere solicitation of an offer to buy a security or interest in a security for value. However, as the Second Circuit explained in *Chris–Craft*, there are perfectly valid reasons to protect investors from premature offers of unregistered securities, particularly where, as here, the offeror has announced that they will be sold at some later date and assigned an approximate monetary value thereto:

> When it is announced that securities will be sold at some date in the future and, in addition, an attractive description of these securities and of the issuer is furnished, it seems clear that such an announcement provides much the same kind of information as that contained in a prospectus.... [I]t is reasonable to conclude that the assigning of a value to offered shares constitutes an offer to sell. One of the evils of a premature offer is its tendency to encourage the formation by the offeree of an opinion of the value of the securities before a registration statement and prospectus are filed. There is then no information on file at the SEC by which the Commis-

sion can check the accuracy of the information which forms the basis of the offeror's estimate of value, and any offeree ... is encouraged to form a premature opinion of value without benefit of the full set of facts contained in a prospectus.

426 F.2d at 574–75.

Left without any persuasive authority, Appellants' argument consists mainly of asserting their own policy reasons in favor of a different outcome. The United States Supreme Court provided the answer to such contentions in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 866, 104 S.Ct. 2778, 2793, 81 L.Ed.2d 694 (1984):

> When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail. In such a case, federal judges—who have no constituency—have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: "Our Constitution vests such responsibilities in the political branches." *TVA v. Hill*, 437 U.S. 153, 195, 98 S.Ct. 2279, 2302, 57 L.Ed.2d 117 (1978).

In *Wimberly*, the Missouri Supreme Court quoted this language with approval and stated that the principle "is no less applicable to state courts." 688 S.W.2d at 350. For these reasons, we reject Appellants' various public policy arguments in favor of a different outcome.

---

4. The Missouri Uniform Securities Act is administered by the Commissioner of Securities, who acts under the direction of the Secretary of State. § 409.406(a).

Finally, Appellants take the Commissioner to task for relying on certain federal cases only for the "narrow" purpose of defining terms without "apply[ing] the entire federal analogy," implying that the Commissioner had some improper agenda to serve what they characterize in their brief as *"his* objective." This misguided challenge is entirely baseless, because Missouri courts have often looked to cases decided by courts from other jurisdictions to aid in comprehending the *definitional* limitations of the Act, particularly when the language of the federal and state securities statutes involved is nearly identical. *See, e.g., Schmid v. Langenberg,* 526 S.W.2d 940, 944–45 (Mo.App. E.D.1975) (relying on federal and state cases construing substantially similar or identical statutes to assist in determining the meaning of the word "solicitation" as used in the Missouri Uniform Securities Act). This limited use of federal cases does not, as Appellants claim, mandate that the Commissioner summarily adopt the entire federal regulatory scheme—including federal rules and statutes that do not appear in, or are substantially different from, the Missouri rules and statutes—in construing and applying the Missouri Uniform Securities Act.

To summarize, we hold that there is competent and substantial evidence on the record as a whole that Appellants "offered" the convertible Notes and yet-to-be-issued Rock Island common stock for value during the February 5, 2003 meeting at Riley Chevrolet within the meaning of the Act as defined in sections 409.401(m)(2)

and 409.401(m)(5). Moreover, we conclude that the Commissioner's interpretation and application of the Act was entirely reasonable, as it is consistent with both the legislative definition of the term and the public policy of the Act. Point denied.

In their second and final point, Appellants contend that the Commissioner erred in determining that they unlawfully offered unregistered securities for sale during the February 5, 2003 meeting at Riley Chevrolet because even if they did make an "offer" to sell unregistered securities during that meeting, they proved that they were entitled to one or more transactional exemptions under section 409.402.

■■■■ "The primary defense available to any person who allegedly offers or sells an unregistered security in violation of § 409.301 is that the security or transaction is exempt from registration under § 409.402." II Glenn E. Davis, "Financial Investment Laws," Missouri Consumer Law & Practice § 11.21 at 11–33 (MoBar 2d ed.1995).[5] In any proceeding under the Act, "the burden of proving an exemption, qualification as a federal covered security, or an exception from a definition is upon the person claiming it." *§ 409.402(f),* RSMo Cum Supp.2002.[6] The quantum of proof required is a preponderance of the evidence, *see State v. Garrette,* 699 S.W.2d 468, 509 (Mo.App. S.D.1985), and the plaintiff (or other party opposing the person relying on the exemption) is "not required to allege or prove that [the unregistered] securities were not exempt from registration." *Id.* at 489–90. Moreover, "[e]xcep-

5. The Commissioner found that "[d]uring investigation of this matter, Moses and Marsh staked their fortunes in this case to their contention no offer had been made, but tried to hedge their position by suggesting possible exemptions." The record bears out this conclusion, as the exemptions appear to have been afterthoughts by Appellants.

6. The same is true of "virtually all federal and state securities laws." I Kathleen S. Schoene, "Securities Regulation," Missouri Business Organizations § 7.33 at 7–39 (MoBar 2001).

tions in a statute should be strictly construed," *Fla. Realty, Inc. v. Kirkpatrick,* 509 S.W.2d 114, 121 (Mo.1974), and registration exemptions are clearly exceptions to the regulatory scheme. *See also Womack v. Georgia,* 270 Ga. 56, 507 S.E.2d 425, 427 (1998) (holding that "exemptions from registration are to be strictly construed in favor of investors"); *Gordon v. Drews,* 358 S.C. 598, 595 S.E.2d 864, 868 (App.2004) ("We are mindful that we must narrowly construe exemptions under the Act because the securities laws are remedial in nature and, therefore, should be liberally construed to protect investors.")

Relying on *Arnold v. Dirrim,* 398 N.E.2d 426, 440 (Ind.Ct.App.1979), and *People v. Dempster,* 396 Mich. 700, 242 N.W.2d 381, 388 (1976), Appellants argue that once they injected the issue of one or more registration exemptions by producing any competent evidence whatsoever of the exempt status of the transactions at issue, "the burden shifts to the other party (here the Commissioner) who is then obliged to prove the facts contrary to the position of the Appellants. So if on affirmative defense issues any competent evidence was produced in favor of the Appellants, and *no* evidence was produced by the Commissioner, the ruling on that issue must be in favor of the Appellants."

■ We disagree, because this argument disregards the "long-established and well-recognized distinctions" in Missouri "between the burden of proof in its strict sense and the burden of going forward with the evidence." *Griffith v. Cont'l Cas. Co.* 290 Mo. 455, 235 S.W. 83, 85 (banc 1921).

■ In Missouri, the burden to prove all affirmative defenses is on the party claiming them. *Warren v. Paragon Technologies Group,* 950 S.W.2d 844, 846 (Mo. banc 1997). It is true that "an affirmative defense, as to which the burden of

proof is on [the] defendant, may be made sufficiently strong by clear and unequivocal verbal evidence that, if same is not contradicted or impeached [by the plaintiff], the court will [find] for [the] defendant." *Downs v. Horton,* 287 Mo. 414, 230 S.W. 103, 108 (1921) (internal quotation marks omitted). However, the "obligation to establish the truth of the claim by [a] preponderance of the evidence rests throughout upon the party asserting the affirmative of the issue, and, unless he meets that obligation upon the whole case, he fails. This burden of proof *never shifts* during the course of the trial." *Id.* (emphasis added). In contrast, the burden of going forward with the evidence "passes from party to party as the case progresses." *Id.*

■ In passing the Act, the General Assembly chose to place "the burden of proving an exemption ... upon the person claiming it." *§ 409.402(f),* RSMo Cum. Supp.2002. Had the legislature intended, as argued by Appellants, to allow a person relying on an exemption merely to come forward with a scintilla of uncontroverted evidence supporting it in order to prevail on that affirmative defense, it would have said so. Instead, it required those individuals claiming an exemption to bear the burden of proving each element thereof to the satisfaction of the finder of fact by a preponderance of the credible evidence, regardless of whether the opposing party presents any contrary evidence. Accordingly, neither *Arnold* nor *Dempster* accurately reflect the law of Missouri as to the affirmative defenses provided in section 409.402, and we decline to follow them to the extent they hold otherwise. Rather, we hold that where, as here, the Commissioner is acting as the finder of fact in an administrative securities proceeding, he "is free to accept or reject all, part, or none of the testimony of a witness." *McAllister v.*

*McAllister,* 101 S.W.3d 287, 291 (Mo.App. E.D.2003).

We now proceed to address each of the three transactional exemptions claimed by Appellants, which are: (1) the limited offering exemption; (2) the accredited investor exemption; and (3) the Regulation D coordinating exemption.

Section 409.402(b)(10), which is often referred to as the "limited offering exemption," is sometimes relied on in private placement offerings by small to medium-sized companies. In relevant part, it exempts "[a]ny transaction by an issuer in a security of its own issue" if all of the following three elements are proven:

(A) during the twelve months' period ending immediately after such transaction the issuer will have made no more than fifteen transactions exempted by this paragraph (other than transactions also exempted by paragraphs (8) *and* (9)[)], and

(B) the issuer reasonably believes that the buyer is purchasing for investment and the buyer so represents in writing[,] and

(C) no commission or other remuneration is paid or given to anyone for procuring or soliciting the sale[.]

§ *409.402(b)(10)* (emphasis added).[7] Therefore, the limited offering exemption only applies

> where an issuer will have made no more than fifteen transactions exempted under the provision (other than transactions which are exempted by the no more than twenty-five holders rule [§ 409.402(b)(9)] or the sale to banks or

financial institutions rule [§ 409.402(b)(8)] ) during a twelve-month period ending immediately after the transaction and where the issuer reasonably believes that the buyer is purchasing for investment and the buyer so represents in writing, and no commission or other remuneration is paid or given to anyone for procuring or soliciting the sale.

26 Philip G. Louis, Jr., "Distribution of Corporate Securities," MISSOURI PRACTICE: BUSINESS ORGANIZATIONS § 26.6 at 14–15 (2d ed.2000).

As to the specific requirements of section 409.402(b)(10)(A), the only evidence presented by Appellants was Moses' brief testimony that he "knew from checking the roster that I think we had seven activities in the past 12 months" prior to the meetings at Riley Chevrolet and Spectators, that "in counting the inventory, the transactions that occurred in the previous 12 months, there was only seven," and that "somewhere, sometime [he had] checked to see if there were any slots available, so the company would have that exemption." Opposing counsel adduced no contrary evidence on this issue, and Appellants provided no additional corroborating evidence, either written or oral. On this issue, the Commissioner found:

> The Commissioner has reviewed the evidence and concluded that [Appellants] have failed to prove the (b)(10) exemption as required by § 409.402(f). An affirmative defense in this proceeding must be proven under the preponderance of the evidence standard. Moses did testify that he believed Rock Island

---

**7.** The italicized word "and," which appears in the phrase "paragraphs (8) and (9)" above, is evidently an inadvertent typographical or scrivener's error, as the entire clause only makes sense if "or" is used. *See* Schoene, *supra,* § 7.33 at 7–38; Lewis R. Mills & George A. Jensen, *The Missouri Uniform Securities Act,* 24 J. Mo. BAR 60, 66 (Feb.1968). The absence of a closing parenthesis (shown in brackets above) appears to be a similar error.

only "had seven activities in the past 12 months," but the Commissioner concludes that Moses and Marsh did not prove the element set forth in subsection (b)(10)(A).... Moses "jumped the gun" on Rock Island's plans to make a private offering, when he distributed the Note or caused it to be distributed at Riley Chevrolet, and then described the anticipated offering in some detail to those present.

■ In their brief, Appellants argue, again based on *Arnold* and *Dempster,* that this was error inasmuch as Respondents presented no evidence disputing Moses' testimony on the issue. However, as we have already held, Respondents had no obligation to disprove Appellants' affirmative defenses and also had no duty to present Appellants' case for them. Rather, it was Appellants' burden to prove each and every element of those defenses by a preponderance of the credible evidence. Performing his role as the finder of fact in this matter, the Commissioner obviously found Marsh's conclusory, uncorroborated, and self-serving oral testimony to be unpersuasive. As we " 'may not substitute our judgment on the evidence for that of the agency, and we must defer to the agency's determinations on the weight of the evidence and the credibility of witnesses,' " *Roorda,* 142 S.W.3d at 789 (quoting *Orion Security,* 90 S.W.3d at 163), the Commissioner's conclusion that Appellants failed to prove the first element of the limited offering exemption is supported by the record, does not constitute an abuse of discretion, was neither arbitrary nor capricious, and was authorized by law.

■ We turn next to the accredited investor exemption, which, pursuant to section 409.402(c), has been established by administrative regulation. *See 15 CSR 30–54.215* (effective April 8, 1993).[8]

The "accredited investor" exemption ... is an exemption for an offer or sale of securities to any "accredited investor" as defined in Rule 501(a) of Regulation D under the Securities Act [of 1933], so long as the broker-dealer or issuer offering or selling the securities obtains a written acknowledgment from the investor that the subject securities are not registered and may be disposed of only through a licensed broker-dealer.

Stinson, Mag & Fizzell, *supra,* § 28.16 at 244 (citing *15 CSR 30–54.215* ). At the time the Riley Chevrolet meeting took place (February 5, 2003), 15 CSR 30–54.215(1) exempted "the following transactions from the requirements of sections 409.301 and 409.403 of the Act":

Any offer or sale of securities to a person meeting the requirements of rule 230.501(a) of the Securities Act of 1933, when the broker-dealer or issuer relying upon the exemption obtains a statement signed by the investor that the security is not registered and may be disposed of only through a licensed broker-dealer. The statement also shall advise the investor that it is a felony to sell securities in violation of the Missouri [Uniform] Securities Act.

*15 CSR 30–54.215(1).*

Meanwhile, 17 C.F.R. § 230.501(a) provides that "accredited investors" include many of the same types of entities that constitute "institutional investors" under the Securities Act of 1933, together with

---

**8.** This regulation has since been amended on several occasions to reflect the passage of the Missouri Securities Act of 2003, which, as noted *supra,* repealed the Missouri Uniform Securities Act and took effect on September 1, 2003. Although the parties spend a great deal of time and effort discussing it in their briefs, the amended regulation was not in effect on February 5, 2003 and is not at issue in this appeal.

certain additional business entities (*e.g.,* any corporation that has total assets over $5 million) and certain individuals (*e.g.,* natural persons with a net worth of $1 million, as well as those who had an individual income in excess of $200,000 in each of the two most recent years and have a reasonable expectation of reaching the same income level in the current year). *See, e.g., 17 C.F.R. §§ 230.501(a)(3), (5), & (6).* Accordingly, although this is something of an oversimplification, reduced to its essence, 15 CSR 30–54.215 essentially allows certain wealthier individual investors and large business entities to knowingly forego the benefits of the registration requirements of the securities laws.

> As to this exemption, the Commissioner found, *inter alia,* that Appellants failed to carry the evidentiary burden of proving the accredited investor exemption. The evidence offered by [Appellants] concerning this exemption were assertions by Moses during his testimony that securities attorneys advised him about the accredited investor exemption and he believed, if an offer was made at Riley Chevrolet, it would exempt the offer. Moses testified that it entered his mind that one of the persons in attendance was wealthy, but no evidence was offered in relation to any of the other individuals in attendance when the offer was made.... Before an entrepreneur *makes an offer* under this exemption, the law clearly requires that he know [whether] the person ... meets the requirements of rule 230.501(a) of the Securities Act of 1933.

The Commissioner's ultimate conclusion was that Appellants "failed to prove the offer[s] at Riley Chevrolet [were] exempt

under Missouri's accredited investor exemption in Rule 15 CSR 30–54.215."

Appellants clearly failed to prove, as required by 15 CSR 30–54.215(1), that *all* of the approximately six or seven individuals from whom they solicited offers to buy unregistered securities during the meeting at Riley Chevrolet (and about whom Appellants knew almost nothing prior to the meeting) were accredited investors "meeting the requirements of" 17 C.F.R. § 230.501(a), particularly in light of the fact that, prior to that meeting, Marsh had been told by Bax that none of Bax's wealthier customers were interested in investing in Rock Island. Accordingly, the Commissioner's ultimate conclusion (which was that that Appellants failed to prove that the offers were exempt under Missouri's accredited investor exemption) is supported by the record, does not constitute an abuse of discretion, was neither arbitrary nor capricious, and was authorized by law.

▆ Finally, we consider the Regulation D coordinating exemption, which the Commissioner has also established by administrative regulation. *See 15 CSR 30–54.210* (effective March 11, 1990).[9] "Mechanically, the regulation exempts offers or sales of securities made in compliance with Rules 505 and 506 of Regulation D which satisfy the additional conditions and limitations in the regulation." Stinson, Mag & Fizzell, *supra,* § 28.16 at 243 (citing *15 CSR 30–54.210* and *17 C.F.R. §§ 230.505 & 230.506* ).

At the time the Riley Chevrolet meeting took place (February 5, 2003), 15 CSR 30–54.210(1) exempted "the following transactions from the requirements of sections 409.301 and 409.403 of the Act":

---

**9.** Like 15 CSR 30–54.215, this regulation has also since been amended on several occasions to reflect the passage of the Missouri Securi-

ties Act of 2003. The amended regulation was not in effect on February 5, 2003 and is not at issue in this appeal.

Any offer or sale of securities made in compliance with the Securities Act of 1933 (the 1933 Act), Regulation D, rules 230.501–230.503 and 230.505 or 230.506, which satisfy [certain] further conditions and limitations [set forth in subsections 1.–3.].

*15 CSR 30–54.210(1)(A).*

Although Appellants boldly assert in their brief that they demonstrated that the offers they made during the meeting at Riley Chevrolet were exempt transactions pursuant to 15 CSR 30–54.210, the record is devoid of any indication that they ever pled or presented any evidence whatsoever regarding that particular exemption. Indeed, the portion of their brief addressing the issue contains no citations whatsoever to any hearing testimony, pleadings, letters, or anything else in the voluminous record before us (which comprises over 800 pages), but consists solely of citations to their Appendix, which merely contains copies of various regulations, including 15 CSR 30–54.210 and Regulation D.[10]

For this reason, the Commissioner made no specific findings concerning Appellants' entitlement to the Regulation D coordinating exemption. However, he did conclude that Appellants "continued to float [exemption] possibilities without pleading or proof throughout the proceeding and into the hearing," thereby "contribut[ing] confusion to this proceeding," and that he considered the two exemptions (discussed *supra*) about which "Moses was able to offer testimony."

The general rule, which applies here, is that "a court should not set aside administrative actions unless the agency has been given a prior opportunity, on timely request by the complainant, to consider the point at issue." *Mills v. Fed. Soldiers Home,* 549 S.W.2d 862, 868 (Mo. banc 1977). Because Appellants did not properly present the exemption during the hearing conducted by the Commissioner, the Commissioner did not have a legitimate opportunity to address it, and Moses and Marsh have preserved nothing for appeal.

In their reply brief, Appellants attempt to meet this argument by contending that since they showed that no actual sales resulted, the offers they made during the meeting at Riley Chevrolet were, *ipso facto*, transactionally exempt pursuant to 15 CSR 30–54.210. This contention is not only entirely unsupported by any case law or other authority, but, if accepted, would also completely·eviscerate the Act. This we cannot and will not do, because, as our Supreme Court has explained, we must read securities registration exemptions "in the light of the rule that a negation in or exception to a statute will be construed so as to avoid nullifying or restricting its apparent principal purpose and the positive provisions made to carry it out." *Fla. Realty,* 509 S.W.2d at 121. Point denied.[11]

## Conclusion

To summarize, the record shows that none of the unregistered securities offered by Appellants to the attendees of the meeting at Riley Chevrolet on the evening of February 5, 2003 were exempt from registration under the Act. Nor were the

---

10. When asked about this during oral argument of this case, counsel for Appellants averred that the Regulation D coordinating exemption had been discussed during informal "conferences with the Commissioner." However, the record on appeal contains no evidence concerning such conferences.

11. The Commissioner made numerous other findings relating to Appellants' failure to prove their claimed exemptions, but in light of our resolution of Appellants' arguments on this point, we need not discuss those additional findings supporting the Commissioner's decision.

offers exempted transactions under the Act. Therefore, the Commissioner's finding that Appellants unlawfully offered unregistered securities for sale during that meeting in violation of section 409.301 of the Act, as well as his decision to enter a remedial order placing certain temporary restrictions on any future efforts by Appellants to raise capital in Missouri, are supported by competent and substantial evidence on the record as a whole, are authorized by law, and are neither arbitrary nor an abuse of administrative discretion.[12]

Accordingly, the judgment of the circuit court upholding the decision of the Commissioner is affirmed.

All concur.

12. Respondents filed a motion, which we took with the case, to strike certain portions of Appellants' amended brief and the Appendix thereto since they refer to or contain certain evidentiary materials (in particular, a purported e-mail exchange between counsel for Appellants and a third party) which were not part of the certified record before the Commissioner as provided in section 536.130. In light of our disposition of this appeal, which is not based on those materials, the motion is overruled. *See Commerce Bank v. Blasdel,* 141 S.W.3d 434, 459 (Mo.App. W.D. banc 2004).